**UNITED STATES of America, Appellee,**

v.

**John J. ZAGARI; Pasquale "Pat" Maselli, aka Pat; Frank Salerno; Frank Trapani, aka Harpo; Angelo J. DiPalo, aka Shorty; Peter Del Cioppo, aka Petey Del; George Merusi; James A. Rogan, aka Jimmy; Raymond E. Ryder; David Zanolini; Morton Wagner, aka Morty, Defendants,**

**Donald Herzog; Alfred Christiansen; \* Charles Shay, Defendants–Appellants.**

Nos. 599, 627, Dockets 96–1120(L)\*, 96–1121, 96–1155.

United States Court of Appeals, Second·Circuit.

Argued Dec. 11, 1996.

Decided April 17, 1997.

---

\* Appeal has been withdrawn.

Judd Burstein, New York City (Marc Fernich, Burstein & Fass L.L.P., of counsel), for Defendant–Appellant Herzog.

Richard D. Willstatter, White Plains (Green & Willstatter, of counsel), for Defendant–Appellant Shay.

Anthony J. Siano, Assistant United States Attorney, New York City (Mary Jo White, United States Attorney, Guy Petrillo, Assistant United States Attorney, of counsel), for Appellee.

Before OAKES, ALTIMARI and PARKER, Circuit Judges.

OAKES, Senior Circuit Judge:

The strictures of environmental law lie at the base of this involved criminal appeal; avoiding these strictures, with high profits forthcoming, resulted in the charges brought against the Appellants. Donald Herzog and Charles Shay appeal from judgments of conviction entered respectively on February 20 and 28, 1996, in the United States District Court for the Southern District of New York, Charles L. Brieant, *Judge*, following a fifteen-week jury trial.[1] Herzog was convicted on one count of violating the RICO statute, 18 U.S.C. § 1962(c), one count of RICO conspiracy, 18 U.S.C. § 1962(d), *four counts of* wire fraud, 18 U.S.C. § 1343, six counts of money laundering, 18 U.S.C. §§ 1956(a)(1)(A)(i), (A)(ii) and (B)(i), one count of violating the Travel Act, 18 U.S.C. § 1952, three counts of mail fraud, 18 U.S.C. § 1341, one count of tax conspiracy, 18 U.S.C. § 371, and one count of tax fraud, 26 U.S.C. § 7206(2). He was sentenced to concurrent terms of imprisonment, forfeiture of $500,000, a supervised release term of three years on each count, and a special assessment of $900. Shay was convicted on one count of wire fraud, 18 U.S.C. §§ 2 and 1343, and sentenced to 60 months' imprisonment to be followed by two years of supervised release and a $50 assessment.

Appellants Herzog and Shay jointly bring two assertions of error. First, they argue that the district court erred by failing to admit Shay's former lawyer's affidavit to impeach the out-of-court statements attributed to the lawyer. Second, they assert that the Appellee ("the Government") withheld information concerning the insanity of a key prosecution witness in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); that the district court improperly denied them a *Franks* hearing, *see Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to determine whether the information gained in the course of the Government's surveillance of defendants ought to have been suppressed; and that the alleged *Brady* material is "newly discovered evidence," the discovery of which warrants grant of a new trial. *Brady,* 373 U.S. at 84, 83 S.Ct. at 1195.

In addition, Appellants bring independent assertions of error. Shay asserts that his sentence was issued in violation of the *ex post facto* clause, and thus that two Sentencing Guidelines provisions were improperly applied to him: the "Conscious or Reckless Risk of Serious Bodily Injury" enhancement, and the increase for "Fraud and Deceit Loss." He therefore asks that we vacate his sentence and remand for resentencing. Appellant Herzog first asserts that the trial judge improperly denied his post-trial motion to dismiss Counts Twenty–Seven, Twenty–Eight, and corresponding RICO Act Twenty, for insufficient evidence. He further argues that the court improperly increased his sentence pursuant to three Sentencing Guideline provisions: the two-level "Obstruction of Justice" enhancement, the four-level "Aggravating Role" adjustment, and the three-level "Value of the Loss" calculation.

Although we disagree with the majority of these assertions of error, we remand Shay's sentence for recalculation under the Guidelines in effect in October of 1989, and Herzog's for further evidentiary findings with regard to a) his perjury in the related state civil action, and b) the enhancement for his leadership role.

---

1. Alfred Christiansen, who was charged and convicted as set forth in this preliminary statement, was sentenced and filed a notice of appeal. After Christiansen's death, however, his appeal was withdrawn.

## I

## Facts

### A. Background

Prior to December 1988, Herzog, Christiansen and others operated without a permit a large landfill, "Buffalo Farm," in Ancramdale, Columbia County, New York. The Buffalo Farm landfill was closed around December 1988 due to regulatory action by New York State environmental authorities. In order to continue profiting from the dumping of construction and demolition ("C & D") debris, Herzog and his associates, including Pasquale Maselli,[2] began to look for a new landfill.

### B. The Matamoras, Pennsylvania, Site

Charles Shay and his wife owned a parcel of land near Matamoras, Pennsylvania, on the Pennsylvania bank of the Delaware River, just across the river from Port Jervis, New York. The site is immediately south of Interstate 84, which crosses a bridge from Port Jervis to Matamoras. Prior to 1988, Shay had been using a portion of the land as a campground and boat-docking area.

In 1969, during the construction of I–84, the property's previous owner had allowed state highway contractors to excavate a large hole from the property. The hole became partially filled with tree stumps and other organic waste, but there remained a large depression on the property. In 1988, the Shays began construction of a restaurant on the property and needed to fill the depression as part of that project. With the help of a local contractor, Raymond Ryder, Shay arranged with a waste broker named Kelly Wall to bring "clean fill" to the site.[3] Instead of clean fill, however, Wall caused shredded demolition waste, municipal waste, construction debris, and other debris ("C & D debris") to be hauled to and dumped at the site.[4]

Apparently, Shay did not consider this to be entirely undesirable. In fact, at some point during this time, Shay's then attorney, Randolph Borden, requested that PADER consider issuing a permit to Shay to use his land as a site for the dumping of C & D debris. PADER responded in the negative, indicating that Shay's property was too close to residential areas and the Delaware River to serve as such a dump site. On October 19, 1988, and December 6, 1988, PADER officials inspected the Shay property and found the landfill material previously dumped by Kelly Wall ("the Wall material") to be environmentally unacceptable. Wall thereafter stopped dumping and abandoned the project.

In January 1989, Donald Herzog, James Rogan and Frank Salerno met with Shay and Ryder and proposed to bring processed C & D to the site.[5] Herzog formed a corporation called Tri–State Land Development, Inc. ("TSLD"), which brought the materials to the site and supervised the work there.

On March 8, 1989, PADER issued an order and assessment of civil penalties, which cited the Shays for the unlawful dumping of the

---

2. Maselli was a "made member" of the Luchese Crime Family, and was the first of Herzog's associates to offer money to Shay for access to the Matamoras landfill to dump C & D debris. After Maselli's direct negotiations with Shay broke down, Herzog began to deal with Shay directly. Maselli was indicted with Herzog but died prior to trial. Maselli's widow testified as a defense witness at trial, admitting that Maselli received vast sums from the landfill and gave cash on a regular basis to Alphonse D'Arco, another high-ranking member of the Luchese Family. D'Arco testified in the Government's direct case pursuant to a plea and cooperation agreement.

3. "Clean fill" is "[u]ncontaminated, nonwatersoluble, non-decomposable inert solid materials." Govt.Br. at 11 (citing Government Exhibit 157

(PADER Regulation § 271.1)). (PADER is an acronym for the Pennsylvania Department of Environmental Resources.)

4. "C & D debris," or "construction and demolition debris," was defined in PADER regulations as "solid waste resulting from the construction or demolition of buildings and other structures, including but not limited to, wood, plaster, metals, asphaltic substances, bricks, block and unsegregated concrete." Govt.Br. at 12 (citing Government's Exhibit 158 (PADER Regulation § 271.1)).

5. PADER officials later testified that, by processed C & D debris, they understood Herzog to mean that the C & D debris was to be cleaned in New York so that it would meet the PADER definition of "clean fill."

Kelly Wall waste and imposed a $20,000 civil penalty. On March 23, 1989, Herzog, Shay and others met with Pennsylvania regulatory authorities to discuss cleanup of the Matamoras site. Herzog proposed to remove the Wall material and replace it with better quality fill. He provided PADER with a list of safeguards to ensure that the Wall material would be properly removed and that clean fill would be dumped in its place. As no permit was required to dump "clean fill," PADER officials told Herzog, Shay and Ryder that they were free to go forward at their own risk.

In fact, however, the evidence at trial showed that even before they met with PADER on March 23, Herzog and Shay had already opened the landfill and accepted C & D debris. "Dump," or "load," tickets admitted at trial showed that C & D debris was dumped at Matamoras as early as January and February 1989. The dumping apparently stepped up after the meeting with PADER, however, though not on the terms discussed with the officials. From March through July 1989, Herzog, Shay and others arranged for the disposal of vast quantities of untreated C & D debris at the landfill. The dumped materials were not segregated or processed in any way, and included substantial amounts of wood, metal and building fixtures. It appears that, during this period, Herzog, Shay and others sought to accept as much C & D debris as possible at the Matamoras site while eluding scrutiny by PADER, law enforcement and local residents. The dumping of C & D debris often took place at night, in the early morning hours, and on Saturdays, presumably in order to avoid PADER scrutiny. Moreover, rather than being removed entirely from the Matamoras site as promised, much of the Wall material was moved to a large pit on the Shay property while the remainder was taken down the road to another unauthorized location known as the "St. Onge site."

In addition to misrepresenting their actions to PADER, the Appellants falsely represented to private waste haulers that they had a permit to operate the Matamoras landfill and to receive C & D debris. The receipt of such debris was, however, conducted in a suspicious manner. Waste haulers and garbage transfer station operators who used the landfill were asked to pay cash; Herzog offered cash discounts and refused to allow certain haulers onto the site unless they first paid in cash. Some of the cash and checks received were deposited by Herzog into a TSLD bank account, but much of the cash was not deposited and was never recorded on TSLD's books and records.

Although the Matamoras landfill operated for only six months, the proceeds of the illegal operation totaled approximately $3 million, of which Shay received a one-sixth cut. In addition, Herzog and his co-defendants paid approximately $500,000 in regular installments to the New York Luchese Crime Family, a fact which Herzog, Ryder and Maselli concealed as part of a conspiracy to defraud the Internal Revenue Service. Herzog's surreptitious payments to the Luchese Family, although independently documented by Herzog, were not recorded in TSLD's books and records.

In May 1989, the ground wells of neighboring residents on Rose Lane began to emit foul odors and brown fluids, and the water acquired a foul taste. After heavy rains, the wells would also emit a brown foam. A May 30, 1989, on-site PADER inspection revealed that defendants were dumping C & D debris and other materials for which a permit was required. The following day, PADER informed Herzog, Shay and Ryder that this waste was unacceptable. On June 7, 1989, PADER mailed the defendants a letter demanding the removal of the Wall material and notifying them that sampling of the debris being dumped at Matamoras would be undertaken. In response to complaints of bad odors coming from the landfill, PADER issued a cease and desist order in July 1989, ordering immediate halting of further dumping at the site.

After the cease and desist order was obtained, PADER employees performed tests on the well water of the residents of Rose Lane, whose wells were down-gradient from the Matamoras landfill. PADER found that the water samples contained elevated levels of heavy metals and other pollutants, which rendered the wells contaminated under fed-

eral water pollution standards. In October 1989, PADER declared the water unfit for human consumption.

Following issuance of the July cease and desist order, Herzog, Shay and others took a number of steps to give PADER the false impression that they had removed the Wall material from the Matamoras site. They dug large pits at the site, which they filled and then bulldozed. Herzog also created a series of false trucking manifests to reinforce the impression that the Wall material had been removed. Specifically, Herzog obtained blank manifests from transfer stations in New York, and caused them to be completed with false indications that the tainted materials had been removed from the Matamoras site. These false "removal manifests" were sent to PADER in October 1989.

By its terms, the July 1989 cease and desist order expired during the summer. In mid-September 1989, Herzog, Shay and others met to make plans to reopen the Matamoras landfill, and agreed on a plan. According to Jerry Dotey, the Government's trial witness, TSLD's lawyer, Borden, would propose to PADER that the already-dumped offending waste would be removed and that a clay liner would be installed at the landfill to protect the ground water. If PADER agreed to this remedial action, the defendants would reopen the landfill and proceed to accept as much C & D debris as possible before PADER discovered their actions. Herzog and the other defendants also agreed to refuse PADER personnel access to the property.

On September 15, 1989, and again on September 19, PADER informed the defendants that no new fill was to be accepted at the Matamoras landfill. Nevertheless, on September 19, trucks carrying debris started arriving at the Matamoras landfill. For the next two to three weeks, Herzog and Shay were present at the landfill regularly while nearly continuous dumping resumed. The site once again began to emit a foul odor and polluted liquid waste.

Residents of Rose Lane began to complain again of odors and well water contamination, as well as of noise at all hours of the night caused by the continuous deliveries of C & D debris to the site. PADER's orders to cease acceptance of debris were, however, ignored. A PADER inspector was denied entry to Shay's property on September 25 and September 26, 1989. FBI surveillance established that night-time dumping occurred on each night from September 25 though September 28, and that Herzog was present during this dumping. On October 6, 1989, the eve of PADER's obtaining an injunction from the Pike County Court, defendants finally ceased accepting debris at the site.

After the second closure of the Matamoras site, and continuing though January 1992, Herzog, Shay and their coconspirators made various efforts to re-open the Matamoras site. To this end, Herzog induced two environmental engineering firms to provide favorable reports concerning the Matamoras landfill. Engineers testified to advising the defendants of the impropriety of dumping C & D debris at the site, of the contamination that the prior dumping was causing, and of the high and ever-increasing costs of remedial measures. According to the Government, when an engineer retained by the defendants would recommend expensive remedial steps, the defendants would simply leave that engineer's bills unpaid and ignore the recommendations.

## C. The Rochester, New York, Site

Ultimately, the defendants' attempts to persuade PADER to allow the Matamoras dump to re-open were unsuccessful. Seeking a new site for C & D dumping, Herzog and Christiansen arranged in mid–1989 to meet Harry Purcell, then the Rochester, New York, Township Supervisor. At this time, the Rochester dump was the subject of a New York Department of Environmental Conservation ("NYDEC") remediation order directing that Rochester reclaim, with stone fill, land that had been excavated during earlier strip-mining on the site of the dump. When Purcell met with Herzog and Christiansen, Rochester had made no progress toward compliance with this order.

Herzog proposed that his newly-created entity, Almordon Environmental Corp., fill in the Rochester site with C & D debris.

Christiansen told Purcell that he could supply test results from Matamoras which would demonstrate to NYDEC that the Matamoras fill was "clean fill." Moreover, Christiansen and Herzog falsely told Purcell that the Matamoras site had regulatory approval. They also both falsely described allegedly stringent control steps followed at the Matamoras landfill to ensure that nothing but C & D debris was dumped at the site, and falsely represented to Purcell that any "bad" materials were removed from the Matamoras landfill site by TSLD. In a letter mailed to Purcell dated July 25, 1989, Borden misleadingly wrote that TSLD's Matamoras operation had fully complied with and exceeded all PADER requirements.

In further discussions, Herzog and Christiansen arranged for what the defendants described as "test loads" of debris to be dumped at the Rochester dump in mid-summer 1989. In October 1989, Herzog asked Jerry Dotey, who represented himself to defendants as a licensed engineer, to prepare false test reports about these test loads for Christiansen to provide Purcell. Herzog and Christiansen each explained to Dotey that Purcell needed to give the NYDEC proof that the "test loads" were untainted. Dotey accordingly altered reports that had been prepared by a laboratory, Prosser Labs, with respect to tests of soil taken from the vicinity of the Matamoras site, to make them seem as though they concerned tests of waste samples taken from the Rochester dump in August 1989. At Christiansen's direction, these altered reports were transmitted to Purcell on October 11, 1989. On November 13, 1989, Christiansen confirmed that he had seen the altered reports.

In early 1990, Purcell made written application to NYDEC, which included the altered Prosser Lab reports, to use the C & D debris to reclaim the Rochester mine site. NYDEC officials rejected the proposed use of C & D debris as reclamation materials, and, on March 2, 1990, wrote a letter to Purcell that was critical of the materials. Despite NYDEC's reaction, Herzog and Purcell agreed that Almordon would build a road within the dump perimeter. Herzog then undertook to obtain approval for dumping from the Town-

ship. In early 1990, Herzog told the Town Attorney, Thomas Halley, that he, Herzog, could reopen the Matamoras landfill "tomorrow" if he wished to do so. Because this statement was in apparent contradiction to information that Township officials had received from persons in Pennsylvania, Halley asked Christiansen for an explanation. Christiansen then materially misrepresented virtually every aspect of Herzog's management of the Matamoras landfill. When Halley subsequently advised the Township Board that it could proceed with the Almordon project, he did so in reliance on these representations.

On May 1, 1990, Purcell signed a contract with Almordon on behalf of the Rochester Township, with Christiansen signing for Almordon. Under the contract, Almordon agreed to test every truckload of C & D debris for gross contaminants, using a "Micro Tip," an expensive specialty device which tests for toxins in the atmosphere; to carry liability insurance on the project; and to pay the Town $2 per cubic yard of waste dumped.

On April 22, 1990, in an intercepted telephone conversation, Herzog told Christiansen not to worry about paying the Micro Tip manufacturer, Photo–Vac International, because they were going to display the tester and then return it with a claim that it did not work. He made similar indications in a May 13, 1990, conversation with Rogan.

Dumping began at the Rochester site on May 10, 1990. In a May 14, 1990, telephone conversation, again intercepted, Christiansen described the defendants' intention to dump up to 250,000 cubic yards of C & D debris in the Rochester dump. Once the dumping began, however, the immediate public reaction was hostile, and due to public pressure and the discovery by a citizens' group that Almordon had not obtained the required permits, the Rochester Township Board voted on June 7, 1990, to stop the dumping.

After extensive investigation by both state and federal agencies, indictment on sixty counts was filed against Herzog, Shay, Christiansen, and eleven co-defendants on Septem-

ber 20, 1993.[6] Trial began on February 6, 1995, and consumed fifteen weeks. Before the jury was charged, the District Court granted defense motions pursuant to Fed. R.Crim.P. 29 to dismiss Counts Three and Four, which charged Herzog, Shay, Christiansen and others with mail fraud and wire fraud directed at the State of Pennsylvania, on the ground that Pennsylvania regulators were not deprived of revenues (in the form of licensing and dumping fees) from the Matamoras dump because Pennsylvania would never have granted a permit for this type of landfill operation. On Government motion, the Court also dismissed Count Thirty–Eight, charging a co-defendant with obstruction of justice, and certain money laundering counts as to defendant Frank Salerno.

On May 18, 1995, the jury returned its verdict. Herzog was convicted of the following eighteen charges: Count One charged all defendants with participating in the conduct of a racketeering enterprise in violation of RICO, 18 U.S.C. § 1962(c), in connection with both the Matamoras and the Rochester landfills; Count Two charged all with conspiring to participate in the RICO enterprise in violation of 18 U.S.C. § 1962(d); [7] Count Five charged Herzog, Christiansen, Shay and others with wire fraud directed at haulers, transporters and processors of C & D debris in connection with the Matamoras site; Counts Seventeen through Nineteen charged Herzog, Shay, Christiansen and others with laundering proceeds of the Matamoras landfill through the Luchese Crime Family in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and (B)(i)(2); Count Twenty charged Herzog, Shay, Christiansen and others with interstate travel to carry on unlawful activity (money laundering) in violation of 18 U.S.C. §§ 2 and 1952; Count Twenty–Seven charged Herzog and one other defendant with mail fraud

directed at CHMR representatives; Count Twenty–Eight charged Herzog and one other with wire fraud directed at CHMR representatives; Count Thirty charged Herzog, Christiansen and others with mail fraud directed at the Town of Rochester; Count Thirty–One charged the same defendants with wire fraud against Rochester; Count Thirty–Three charged Herzog, Christiansen and one other defendant with mail fraud directed at Photo–Vac International; Count Thirty–Four charged the same defendants with wire fraud directed at Photo–Vac; Count Forty–Two charged Herzog and others with conspiracy to defraud the IRS in violation of 18 U.S.C. § 371, by hiding payments made to members of the Luchese Crime Family; Count Forty–Three charged Herzog and others with aiding in the filing of false tax returns which failed to disclose the payments to the Lucheses, in violation of 26 U.S.C. § 7206(2); and Counts Fifty–Seven through Fifty–Nine each charged Herzog and others with money laundering with intent to engage in conduct constituting a violation of 26 U.S.C. § 7206, in violation of 18 U.S.C. §§ 2 and 1956(a)(1)(A)(ii). Herzog was acquitted of the remaining counts and predicate acts charged against him. Shay was convicted only on Count Five and acquitted of the remaining counts. Christiansen was convicted on Counts One, Two, Thirty, Thirty–One, Thirty–Three and Thirty–Four, and acquitted of all other counts; the remaining defendants [8] were acquitted of all charges.

On February 20, 1996, the court sentenced Herzog to 151 months' imprisonment on each of Counts One, Two, Seventeen through Nineteen, and Fifty–Seven through Fifty–Nine; 60 months' imprisonment on Counts Five, Twenty, Twenty–Seven, Twenty–Eight,

6. Prior to trial, co-defendant Maselli died; co-defendant Ryder pleaded guilty pursuant to a cooperation agreement to the substantive RICO charge in Count One, to one money laundering charge (Count Forty–Six), and to the forfeiture count; and codefendant Zagari pleaded guilty to a superseding information charging him with being an accessory after the fact to mail fraud, in violation of 18 U.S.C. §§ 3 and 1341.

7. Counts One and Two alleged twenty-eight acts of racketeering in furtherance of the charged

enterprise (many of which alleged acts were separately charged in additional counts of the indictment), including various acts of mail and wire fraud, money laundering, extortion, bribery, interstate travel in aid of racketeering, and obstruction of justice.

8. Frank Salerno, Frank Trapani, Angelo DiPalo, Peter Del Cioppo, George Merusi, James Rogan, David Zanolini, and Morton Wagner.

Thirty, Thirty–One, Thirty–Three, Thirty–Four, and Forty–Two; and 36 months' imprisonment on Count Forty–Three; all to run concurrently. It also sentenced Herzog to forfeiture of $500,000,[9] a supervised release term of three years on each count, and a special assessment of $900. On February 28, 1996, the court sentenced Shay to 60 months' imprisonment on Count Five, to be followed by a term of supervised release of three years. It further imposed the usual special assessment of $50 against Shay. Herzog is currently serving his sentence. Shay is on bail pending appeal.

## II

### Discussion

#### A. Joint Assertions of Error

Appellants Herzog and Shay jointly bring two assertions of error: The first relates to the court's refusal to admit the affidavit of Shay's former attorney; the second relates to the Government's alleged knowledge and suppression of evidence which would have impeached Jerry Dotey, an important Government witness.

#### 1. Borden's Affidavit

Appellants first contend that the district court erred in refusing to admit an affidavit of Randolph Borden, Esq., Shay's former attorney, which Borden submitted to the United States Attorney's Office and the FBI in an effort to avoid indictment. After Borden was arrested and charged with mail and wire fraud, he undertook to convince the Office and the FBI that his conduct in the Matamoras matter had been consistent with his professional obligations, and that he had at no time harbored criminal intent. To this end, he submitted a sworn statement which outlined his response to the Complaint and sought to explain his innocence. Soon after being indicted, Shay demanded production of documents which Borden had provided to the Government in an effort to avoid prosecution. The Government disclosed these documents upon court order, but withheld the Borden

affidavit until mid-trial. In the affidavit, Borden recounted giving Shay his opinion that the regulations were legally suspect, and recalled advising Shay at a September 1989 meeting that dumping could be lawfully resumed provided the Shay group followed his advice, i.e., dump only processed C & D, remove the so-called leaded materials, erect a clay liner, and test the new fill prior to dumping. Further, Borden swore he advised Shay that completion of the reclamation project with new processed C & D could be defended in court.

Prior to cross-examining Dotey, Shay sought to introduce this affidavit under Fed. R.Evid. 806 to impeach statements attributed to Borden by Dotey and others. Defendants argued that the affidavit impeached the statements because it showed, *inter alia*, that Borden advised Shay to take steps to ensure that the new dumping could be "defensible in court," and therefore contradicted Dotey's testimony as to what Borden had said at the critical September 1989 meetings.

The district court denied Appellants' request, ruling that the statements were "not a basis of cross examination for [Dotey]. They're admissible, if you want, and you will be entitled to receive them. And when you do, I think you're entitled to offer them."

Later, however, when the defense sought to introduce the Borden affidavit to impeach the veracity of statements attributed to Borden by Dotey, the district court refused. In response to an application that defendants be permitted to impeach a non-testifying declarant with the affidavit as provided by Rule 806, the court responded that the Borden statements were offered for the fact that they were said in the presence of the defendants, but were not admitted for the truth of the matter asserted. Therefore, the statements were not hearsay admitted under either one of the Rule 803 exceptions to the hearsay rule or as statements of a co-conspirator.

We first address whether the court correctly admitted the statements as non-hear-

**9.** In addition, Herzog and Christiansen consented to a $500,000 order of forfeiture pursuant to a stipulation entered into after the verdict was returned in order to resolve Count Sixty, which had been bifurcated and was not resolved by the verdict.

say rather than as co-conspirator statements. Borden's statements could not have been elicited for the truth of the matters he discussed unless the Government had been attempting to show that Borden's legal advice was accurate, which was clearly not the case. Furthermore, even Herzog conceded at argument to the district court that Borden's statements only served to demonstrate the defendants' scienter, not to prove any other facts underlying the charges.

We are somewhat concerned by the court's failure to grant a limiting instruction as to the purpose for which the Dotey testimony about Borden's statements was admitted. Rule 105 makes such an instruction mandatory, if it is requested. However, a review of the record reveals that none of the defendants objected to the admission of the Dotey testimony at the time the Borden statements came into evidence, nor did any defendant request a limiting instruction at that time. Furthermore, during Dotey's cross-examination, when the court ruled that the Borden affidavit could not be used for impeachment purposes because the Borden statements were not admitted for the truth, no defendant requested a limiting instruction. After the evidence was closed, Shay sought again to have the proffer admitted under Rule 806. Even at that time, neither Shay nor Herzog requested a limiting instruction—rather, Herzog requested that the Government be prohibited from arguing that Borden was a co-conspirator (which the Government in fact never did argue). At that time, Christiansen's counsel requested an inappropriate limiting instruction to the effect that the Borden statements are "only admissible as to what he said and what his intent was." That request was incorrect because it was not Borden's intent but the defendants' intent that was at issue.

 Without deciding whether Shay and Herzog can now rely upon Christiansen's

dilatory and inexact request for a limiting instruction, we hold that if the failure to give an instruction was error, it was harmless error. First, as indicated above, the Government never contended to the jury,[10] at any point in the trial, that Borden should be viewed as a co-conspirator. Furthermore, defendants were free to manage the jury's potential confusion by attacking Dotey's credibility, his recollection of what was said during the September meetings, and his motive to fabricate. And, they in fact did so, as discussed fully in the next section of this opinion. Defendants also could have presented conflicting testimony as to what was discussed at those meetings to refute Dotey's recollection. We conclude that Dotey's testimony was properly admitted, not for the truth of the matter asserted, but simply to show defendants' scienter.

Having held that the court properly considered Dotey's statements to be non-hearsay, it follows that Rule 806 does not apply to the proffered Borden affidavit. Rule 806 provides in pertinent part: "When a hearsay statement, or a statement defined in Rule 801(d)(2), (C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness." Fed.R.Evid. 806.[11] Because Rule 806 is not applicable to non-hearsay statements, and because Dotey's statements are not of the sort defined in Rule 801(d)(2)(C), (D), or (E), the Rule by its very terms is irrelevant to Dotey's statements, and the affidavit did not fall within Rule 806. We thus uphold the court's ruling.

## 2. Insanity of Jerry Dotey

Second, Appellants both assert that the Government withheld information showing that Jerry Dotey was insane. Appellants assert that, subsequent to trial, they un-

---

10. Shay's counsel points out that the Government, at one point, contended to the court that Borden was a co-conspirator, but that position was apparently abandoned and never argued to the jury.

11. Thus, the Rule permits introduction of out-of-court statements of a co-conspirator for the pur-

pose of impeachment where the co-conspirator's statements have been admitted in evidence under Rule 801(d)(2)(E). *United States v. Myerson,* 18 F.3d 153, 161 (2d Cir.1994). Dotey's statements, however, were correctly not admitted as co-conspirator statements.

earthed evidence that Dotey had been clinically diagnosed as a "pathological liar" with "serious psychological problems" and "a multiple personality disorder." Specifically, Dotey apparently suffered from delusions that he had a second German identity, and believed that he had been born in Nazi Germany to a Gestapo "spymaster," "smuggled into the United States," and "switched at birth with an American baby." He professed to have been kidnapped, brainwashed, and tortured by "the Group," a neo-Nazi cabal seeking to take over the world and create a "Fourth Reich" through, among other methods, genocide, mind control, genetic engineering, and state-sponsored slavery.[12]

Throughout the years, Dotey has been investigated by federal agents for assorted conduct. For example, Dotey claimed to have murdered witnesses to the assassination of President Kennedy. He sparked an FBI investigation after stealing money from the Atlantic Richfield Company ("ARCO"), his former employer, then staging his own kidnapping, alleging that black, Puerto Rican and Cuban terrorists "beat him up, took [the] money and held him prisoner on a boat off the coast of South Carolina," and forging a ransom note to President Carter demanding the release of Cuban prisoners. He later asserted that ARCO agents, dressed in SS regalia, had tortured, drugged and hypnotized him, programming him to massacre President Reagan and everyone else at the 1985 inauguration via germ warfare.

Dotey, his lawyer and his psychologist memorialized all these comments in complaints, letters and videotapes to agencies including the Justice Department and the Secret Service. ARCO also forwarded Dotey's personnel file to the FBI. The Secret Service personally interviewed Dotey, his lawyer and his psychologist in connection with the Reagan assassination plot. The record also indicates that the Secret Service knew of a Dotey-related plot to kill President Bush in 1991, two years after investigation of the Matamoras site case began.

### a. *Brady* Material

Upon discovery of the evidence relating to Dotey's alleged insanity, Appellants moved for a new trial, claiming that the Government suppressed information relating to the alleged insanity in violation of *Brady*. The district court rejected Appellants' motion as lacking sufficient evidentiary basis. The court found that the statements were corroborated by independent sources, including federal and state law enforcement agencies and documents, as well as the consensually recorded statements of certain defendants. On appeal to this court, Appellants maintain that a remand is necessary to explore whether the Government suppressed information in violation of *Brady*. They further challenge the trial court's finding that the evidence they presented on this point was not "material."

"[T]he government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987) (citing *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); and *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196). A grant of a new trial is warranted if this obligation is not fulfilled. *United States v. Wong*, 78 F.3d 73, 79 (2d Cir.1996). Evidence is material if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a

---

12. In his various conversations with federal officials and psychologists, Dotey claimed that he was tortured by Dr. Joseph Mengele in the presence of former CIA director Richard Helms. Mengele, Dotey said, also kidnapped American children and brought them to "an evil lair in Florida" for "unspeakable purpose[s]." In addition, Dotey stated that he had been told by Mengele that Mengele had trained Lee Harvey Oswald.

Dotey maintained that the Group, which he said espoused a Hitlerian philosophy of Aryan nationalism and totalitarian control over all aspects of human behavior, was planning the mass extermination of American Jews in Nazi-style death camps. He held them responsible for other horrific activities, ranging from Watergate to forcing Dotey to watch the rape of his wife and the beating of his pregnant sister. He also asserted that the Group's constituents included at least one former U.S. President, top federal officials, and numerous Supreme Court Justices and other federal judges.

probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (opinion of Blackmun, *J.*). We conduct an independent examination of the record to determine whether *Brady* has been violated in a nondisclosure claim, and we likewise make an independent review of a district court's determination of materiality, which is a mixed question of fact and law. *United States v. Payne,* 63 F.3d 1200, 1209 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996). Nevertheless, "the trial judge's conclusion as to the effect of nondisclosure on the outcome of the trial is 'entitled to great weight.'" *United States v. Rivalta,* 925 F.2d 596, 597 (2d Cir.1991) (quoting *United States v. Provenzano,* 615 F.2d 37, 49 (2d Cir.1980)).

■ We first hold that the Government here did not suppress information so as to violate its obligation under *Brady. Brady* cannot be violated if the defendants had actual knowledge of the relevant information or if the documents are part of public records and "defense counsel should know of them and fails to obtain them because of lack of diligence in his own investigation." *Payne,* 63 F.3d at 1208 (citing *United States v. Bermudez,* 526 F.2d 89, 100 (2d Cir.1975) (state investigative files were available to defense with the exercise of due diligence)). Here, Appellants had actual knowledge of the witnesses with information about Dotey—the defense admittedly knew of Scott and Rosenbaum, and had contacted Scott prior to trial.[13]

■ In addition, we agree with the trial court that the evidence here was not material to Appellant's convictions. Certainly, several

of Dotey's assertions are alarming: His statement that the Group "routinely (virtually daily) implicates many, many innocent people all over this country in crimes they have not committed," as well as his apparent anti-Semitism, provides a strong evidence of lack of credibility and of potential bias against Herzog, who is Jewish. Had the jury's verdict relied solely or largely upon Dotey's testimony and had his testimony been otherwise unimpeached, we might have considered the evidence to be material, although we note the principle of cases such as *United States v. Reyes,* 49 F.3d 63, 68 (2d Cir.1995) ("New evidence that is merely impeaching will not ordinarily justify a new trial.") *Id.* (citing *Mesarosh v. United States,* 352 U.S. 1, 9, 77 S.Ct. 1, 5, 1 L.Ed.2d 1 (1956)); *see United States v. Aguillar,* 387 F.2d 625, 626 (2d Cir.1967) ("The discovery of new evidence which merely discredits a government witness and does not directly contradict the government's case ordinarily does not justify the grant of a new trial.").

Here, however, there is substantial reason to agree with the district court's opinion that the jury had information with which to evaluate Dotey's credibility, though perhaps not as much information as Appellants would have liked. Dotey was cross-examined as to lying about his association with the CIA, lying about being a licensed engineer, his false statements in civil litigation, his false statements on credit card applications, logical gaps in his claim that he had been shot at during the investigation, his falsification of professional credentials and engineering documents and Prosser lab reports, his prior inconsistent statements before the grand jury, his misstatements to the FBI about his personal background, the financial abandonment of his children, his enormous tax debt,

---

**13.** Although the Government also argues that *Brady* was not violated because the prosecution lacked actual or constructive knowledge of the evidence, we decline to rest our holding on this point. The extent to which knowledge may be imputed from one federal investigative agency to another for *Brady* purposes is as yet unclear. *Cf. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (assuming without discussion that state prosecutor's office had imputed knowledge of information available to state child services division's investigative officers, even though prosecutor had no actual knowledge of information). Be-

cause it is clear to us that *Brady* was not violated because of the lack of materiality and the defense's ability to access the information about Dotey with due diligence, we need not address the Government's contention that *Brady* does not apply because the prosecution was unaware of certain statements made by Dotey to the Secret Service in 1985. We do note, however, the Government's argument that it could not have failed to disclose a draft document written by Dotey's former attorney because the Government did not possess this document until it was provided by the defense.

his loss of relevant records, his own involvement in the charged crimes, the civil judgments against him, the foreclosure on his home, bad checks he had written, and his acceptance of expense money from the FBI. This alone might be enough to make the evidence of his bizarre statements cumulative and non-material. *See United States v. Diaz*, 922 F.2d 998, 1006–07 (2d Cir.1990) (newly discovered evidence that informant had stolen money from the Government would have provided redundant impeachment of a witness whose credibility "had in fact been attacked repeatedly").

Still, however, were Dotey's evidence the only support for Appellants' convictions, we would be concerned that perhaps the evidence of his mental condition is material, particularly considering the prosecution's summation remarks relating to Dotey's credibility.[14] Yet we agree with the trial judge's assessment that as to the convicted counts, the jury did not rely entirely upon Dotey's testimony, but independent evidence corroborated all evidence. We thus hold that the evidence relating to Dotey's insanity and neo-Nazi leanings is not material, in that there is not a reasonable probability that the evidence, if presented to the jury at trial, would have affected the verdict. Although it does not appear that the Government suppressed this evidence, such a suppression would not warrant grant of a new trial because it is not material.

#### b. *Franks* Hearing

Appellants next assert that the district court improperly denied their request for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). *Franks* tells us that evidence obtained by the Government must be suppressed at trial if the Government concealed facts that were material to an informed probable cause determination, and that the defense is entitled to a hearing on this matter if it makes a substantial showing that a false statement was knowingly, intentionally or recklessly included in the warrant affidavit, and that the allegedly false statement was necessary to the finding of probable cause.

As part of its application to initiate Title III interception of certain communication devices during its investigation, the Government submitted the affidavit of Special Agent Marston of the FBI. That affidavit contained a disclosure that Special Agent Marston had had conversations with Dotey beginning in August of 1989, relating to Dotey's statements that he had conducted covert activities on behalf of the CIA. In the affidavit, Special Agent Marston noted that he had spoken with Dotey's former psychologist, a man who had also been retained as a consultant for the FBI on unrelated matters, and that the psychologist had determined, after independent verification of some of Dotey's CIA-related claims, that Dotey was "a credible person from whom to receive information." Special Agent Marston further stated that "[i]n dealing with Dotey, I have continually sought to independently verify the accuracy of the information that he has furnished. On each and every occasion I have found that his information has proven to be truthful, reliable, and accurate."

Prior to trial, Appellants filed motions for a *Franks* hearing seeking to suppress the recorded evidence gathered in the Title III investigation, asserting that Agent Marston had not revealed the existence of significant information impeaching Dotey's general credibility. The court denied the motion. Appellants maintain that remand is neces-

---

**14.** The prosecution attempted to rehabilitate Dotey during summation by stating:

 Mr. Dotey could have behaved like a great many people in this case chose to behave. See no evil, hear no evil, speak no evil. . . .

 Mr. Dotey didn't need to pick up the telephone and call the FBI. He could have just taken the defendants' money and run, but he didn't.

 . . . .

 Mr. Dotey begins to cooperate in August of 1989 and he cooperated, and he got on the stand with no immunity and no promises, no protection, and every problem he had before he got on the witness stand he still has, but he chose to do something that these defendants cannot abide, I submit. He showed some spine. He was willing to sit on this witness stand and be ridiculed and demeaned by these defense attorneys. . . .

 Well, Mr. Dotey has a spine. He got on the stand, he testified warts and all. . . .

sary to explore whether the Government's application for Title III interception was materially misleading.

■ We hold that the court correctly denied Appellant's motion for a *Franks* hearing. Agent Marston's affidavit does not represent that he undertook an exhaustive exploration of Dotey's personal background; rather, it states that he fully explored issues with Dotey himself and discussed some of his claims with Dotey's psychologist, who confirmed Dotey's statements. Marston made no claim that he attempted to verify Dotey's general credibility by conducting a complete investigation into his past. Nothing before us indicates that Agent Marston's representations were false or misleading, and there was therefore no basis for a *Franks* hearing.

#### c. Newly Discovered Evidence

■ When a trial court learns of newly discovered evidence after a conviction, it should grant a new trial "if the defendant makes a showing that the evidence is in fact 'new', i.e., it could not have been discovered, exercising due diligence, before or during trial, and that the evidence is so material and noncumulative that its admission 'would probably lead to an acquittal.'" *United States v. Siddiqi*, 959 F.2d 1167, 1173 (2d Cir.1992) (quoting *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir.1980)). "[A] district court must exercise 'great caution' in determining whether to grant a retrial on the ground of newly discovered evidence, and may grant the motion only *in the most extraordinary circumstances.*" *United States v. Spencer*, 4 F.3d 115, 118 (2d Cir.1993) (emphasis in original) (citations and quotation marks omitted). On review, "[a]n appellate court must weigh whether or not there is in reality a 'significant chance' that the disclosure would have induced a reasonable doubt in the minds of enough jurors to prevent a conviction." *United States v. Rosner*, 516 F.2d 269, 273 (2d Cir.1975) (citations omitted).

■ This standard is very similar to the *Brady* test, though it of course incorporates no element of Government action or inaction. We reject this argument for substantially the same reasons articulated in our discussion and rejection of Appellants' *Brady* argument. First, the evidence relating to Dotey's insanity is not 'new' because it could have been discovered by the defense before or during trial. Second, the evidence is not material, in that its admission does not cast doubt upon the verdict in light of the substantial other cumulative evidence against Shay and Herzog as well as the impeachment evidence against Dotey of which the jury was aware. The extraordinary circumstances of which *Spencer* speaks are not present here, and Judge Brieant did not err in refusing to grant a new trial.

### B. Independent Assertions of Error

In addition to the allegations of error regarding Borden and Dotey which Appellants raise jointly, they also bring independent assertions of error.

#### 1. Shay's Assertions of Error

Shay asserts that his sentence was issued in violation of the *ex post facto* clause of the U.S. Constitution. He also argues that two sentence increases were improperly applied to him: the two-level "Conscious or Reckless Risk of Serious Bodily Injury" enhancement, and the twelve-level "Fraud and Deceit Loss" increase. He therefore asks that we vacate his sentence and remand for resentencing.

We begin by setting out the principles of law applicable to our review of a district court's application of the Sentencing Guidelines, which will apply to much of the section of this opinion addressing Herzog's claims as well as those of Shay.

■ Section 1B1.3 of the Guidelines provides that "relevant conduct" may be considered at sentencing as a reason for upward departure. U.S. Sentencing Guidelines Manual [hereinafter "U.S.S.G."] § 1B1.3 (1989). Despite the contrary view held by some members of this court, *see United States v. Frias*, 39 F.3d 391, 392–94 (2d Cir.1994) (per curiam) (Oakes, *J.*, concurring), *cert. denied,* —— U.S. ——, 115 S.Ct. 1433, 131 L.Ed.2d 313 (1995); *United States v. Concepcion*, 983 F.2d 369, 395–96 (2d Cir.1992)

(Newman, *J.*, dissenting from denial of *en banc* review), the Supreme Court recently confirmed the prior holdings of this court that the burden of proof for relevant conduct increases, including conduct of which the defendant has been acquitted, need only meet the preponderance of the evidence standard, not the higher clear and convincing evidence standard. *United States v. Watts,* —— U.S. ——, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (per curiam); *Concepcion,* 983 F.2d at 388 (majority opinion); *United States v. Gigante,* 94 F.3d 53 (2d Cir.1996). We therefore must refuse Appellants' request that we apply a clear and convincing standard to certain of the points argued below, and instead review the district court's application of the preponderance standard. Of course, we review a district court's interpretation and application of the Guidelines *de novo, United States v. Palmer,* 68 F.3d 52, 54 (2d Cir.1995), and its findings of related fact for clear error, *United States v. Ibanez,* 924 F.2d 427, 430 (2d Cir.1991); 18 U.S.C. § 3742(e).

### a. *Ex Post Facto*

The district court sentenced Shay to 60 months' imprisonment and two years' supervised release, as well as a $50 assessment, for his conviction on the wire fraud charge.

■■■■ Shay's primary argument at sentencing and here is premised upon the *ex post facto* clause,[15] which prohibits Congress from passing a law that increases the punishment for a crime after it has been committed. *United States v. Harris,* 79 F.3d 223, 228 (2d Cir.) (citing *Collins v. Youngblood,* 497 U.S. 37, 41–42, 110 S.Ct. 2715, 2718–19, 111 L.Ed.2d 30 (1990)), *cert. denied,* —— U.S. ——, 117 S.Ct. 142, 136 L.Ed.2d 89 (1996). Ordinarily, a court ought to apply the version of the Guidelines in effect at the time of sentencing. 18 U.S.C. § 3553(a)(4)(A). If, however, there is an *ex post facto* problem, the version in effect at the time the offense occurred should be used. *United States v.*

*Paccione,* 949 F.2d 1183, 1204 (2d Cir.1991); *United States v. Adeniyi,* 912 F.2d 615, 618 (2d Cir.1990). *See also,* U.S.S.G. § 1B1.11(b)(1) (1995) ("If the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *ex post facto* clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed."). An *ex post facto* problem arises if the version in effect at the time of sentencing " 'makes more onerous the punishment for crimes committed before its enactment.' " *Miller v. Florida,* 482 U.S. 423, 435, 107 S.Ct. 2446, 2453–54, 96 L.Ed.2d 351 (1987) (quoting *Weaver v. Graham,* 450 U.S. 24, 36, 101 S.Ct. 960, 968, 67 L.Ed.2d 17 (1981)); *accord, Paccione,* 949 F.2d at 1204.

Shay objects to Judge Brieant's application of the November 1, 1989, Guidelines Manual which, he asserts, became effective after the wire fraud scheme was completed. Shay maintained at sentencing that "as soon as they got a preliminary injunction from the court [in October 1989], no further representation was made to a trucker that further dumping was legal...." He asserted that, because the offense conduct for which he was convicted took place between February and early October of 1989, he could not constitutionally be sentenced under Guideline amendments which became effective after that time period, and his sentence must therefore be vacated and remanded.

If Shay is accurate in stating that his conduct ended in October of 1989, the trial court's use of the November 1989 Guidelines does violate *ex post facto* principles, because the later Manual yields a more onerous offense level—up to five levels higher—than does the earlier Manual.[16] The Government, however, argued that Shay's misconduct continued past October of 1989 and through 1992, by virtue of his "attempt to re-open the landfill, with respect to misrepresentations to

---

15. "No ... ex post facto Law shall be passed." U.S. Const. art. I, § 9, cl. 3.

16. The district court agreed as much. ("If your version of the facts is correct, I think that's true.") As discussed *infra,* Amendment 154 to the "Value of the Loss" enhancement changed

the increase in level for a loss between $1 million and $2 million from nine to either eleven or twelve. Amendment 156 implemented the "Conscious or Reckless Risk of Serious Bodily Injury" enhancement, which added two levels to Shay's sentence.

the victim, which is [PADER]." The Government therefore insisted that the date of the Count Five wire fraud offense, for Guidelines purposes, was the last day of that continuing misconduct. Shay responded by pointing out the Government's concession that the victims of the misconduct charged in the wire fraud were "these truck drivers," not PADER. He argues that the facts alleged to support the continuance of the wire fraud scheme beyond October of 1989 concern a separate set of misconduct involving different *actus rei* and affecting different victims. Notably, the charges asserting misrepresentations against PADER were separately charged, and later dismissed pursuant to Fed.R.Crim.P. 29(c).

Judge Brieant initially noted that all of the wire communications specified in the charge were alleged to have been made prior to November 1, 1989, and observed that if no later misrepresentations were alleged, the *ex post facto* clause would require application of those Guidelines in effect in October of 1989. He expressed his concern that the object of the wire fraud scheme could no longer be achieved once the dump closed on October 5th or 6th of 1989 and money was no longer being received from any trucker. Ultimately, though conceding that it was "a close question," the judge imposed the November 1989 Guidelines in reliance on the dismissed PADER fraud counts, reasoning that even though a *prima facie* case was not made out on those counts, the conduct was "relevant conduct" which could be used as the basis for the enhancement.

■ The question which we must initially answer, therefore, is whether the conduct which was charged under Count Five can properly be held to include Shay's continuing conduct into 1992. We hold that it does not. Not only was the conduct against PADER separately charged, but the trial judge dismissed that charge for lack of a critical element—loss of money or property on PADER's part. This, along with the judge's initial comments at sentencing, indicates to us that the two counts are not properly subsumed into one huge scheme to defraud, as the Government asserts, but rather should be thought of as separate schemes to defraud separate victims.

As noted *supra*, uncharged or unconvicted relevant conduct, if proved by a preponderance of the evidence, may be considered when calculating the base sentence. As the judge noted, therefore, he could have properly considered the fraud against PADER as a relevant conduct enhancement to Shay's sentence, assuming the Government met the burden of proof by a preponderance of the evidence on that conduct. Unfortunately, this is not what the court actually did, and therefore *Watts* and *Concepcion* principles do not decide this case. Rather than applying an enhancement, the court seemed to meld together the two separate schemes and consider them as one large, continuing scheme of fraud. This was not appropriate. The judge was not permitted to alter the date on which the convicted conduct "occurred" to reflect the date on which unconvicted relevant conduct was committed.

Having decided that Count Five refers only to the fraud against the truckers and does not encompass fraud against PADER, the question we must answer, for *ex post facto* analysis, is a very narrow one: When uncharged or acquitted conduct occurs after the conduct of conviction, does the *ex post facto* clause prohibit application of Sentencing Guidelines applying to the later conduct rather than those in effect at the time the convicted conduct ended? The Commentary to the November 1995 Manual has addressed this specific constitutional issue, and states unequivocally that Congress did not intend for a particular set of Guidelines to apply to conduct which occurred prior to its passage:

> Under subsection (b)(1), the last date of the offense of conviction is the controlling date for *ex post facto* purposes. For example, if the offense of conviction (*i.e.*, the conduct charged in the count of the indictment or information of which the defendant was convicted) was determined by the court to have been committed between October 15, 1991 and October 28, 1991, the date of October 28, 1991 is the controlling date for *ex post facto* purposes. This is true even if the defendant's conduct relevant to the determination of the guideline range under § 1B1.3 (Relevant Conduct) included an act that occurred on November

2, 1991 (after a revised Guideline Manual took effect).

U.S.S.G. § 1B1.11 comment. (n.2) (Nov.1995). This set of Guidelines thus requires the district court to determine the last date of the offense of conviction, and instructs that the date of relevant conduct may not be substituted for the date of convicted conduct. Although we are not compelled to rely upon this Commentary because it is not incorporated in either of the Manuals considered here, we find it to be highly persuasive evidence of the Sentencing Commission's intent. Because it comports with *ex post facto* considerations, we happily utilize it in our interpretation of the Guidelines. We therefore hold that Judge Brieant's use of the November 1989 Guidelines to sentence Shay for a course of conduct which ended in October 1989 violated the *ex post facto* clause.

Shay's sentence is vacated and remanded for re-sentencing in accordance with the Guidelines in effect during October 1989. Upon resentencing, the court may take into account any secondary conduct proved by a preponderance of the evidence. We caution the court, however, that if it finds such relevant conduct occurred, Shay's penalty may only be increased to the extent permitted under § 1B1.3 of the Guidelines in effect in October of 1989, even if the relevant conduct occurred when the November 1, 1989, Guidelines were in effect. We so instruct the court in reliance upon the "one-book rule." *See United States v. Keller*, 58 F.3d 884, 890 (2d Cir.1995) ("A sentencing court has no authority to pick and choose, taking one provision from an earlier version of the guidelines and another from a later version. We adhere to the so-called 'one-book rule' that most other circuits use to avoid twisting the guidelines, depriving them of uniformity and consistency."). *See also, United States v. Bertoli*, 40 F.3d 1384, 1404 n. 17 (3rd Cir.1994) ("[W]hen

*ex post facto* clause issues arise, while the one-book rule cannot apply to compel application of the *later* Manual to all counts, it can certainly compel application of the earlier Manual.").

#### b. Sentencing Enhancements

Having determined that the court improperly utilized the November 1989 Guidelines, our ·task becomes simpler and the district court's more burdensome with regard to Shay's other assertions of error. First, he argues that the district court improperly imposed a two-point enhancement for Shay's "conscious or reckless risk of serious bodily injury" pursuant to § 2F1.1(b)(4) (1989). The court imposed the sentence in consideration of Shay's asserted disregard for the health of his neighbors, whose water wells were contaminated by the waste in the Matamoras landfill. Although Appellants and the Government have fully briefed the issue of whether Shay's conduct constituted conscious or reckless risk of "serious bodily injury," as defined by § 1B1.1, comment. (n.1(j)), we need not address that point. The § 2F1.1(b)(4) enhancement was not in effect until the November 1989 version of the Manual, and thus Shay cannot be sentenced in consideration of it.[17] We therefore remand for resentencing in consideration of the October 1989 Guidelines.[18]

We likewise must remand for recalculation of the "Fraud and Deceit Loss" for which Shay was responsible. The PSR's calculation of the loss under § 2F1.1(b)(1) (1989) determined that a 12–level enhancement was appropriate based on an estimate of between $1,500,000 and $2,500,000 in loss, nearly the entire amount grossed by TSLD between February and October 1989. Appellants asked the court to make particularized findings as to what amount of fraud was attributable to Shay, and asked that the court find

---

**17.** The commentary to the amended section states: "The purpose of this amendment is to reflect the instruction to the Commission in Section 2(b) of the Major Fraud Act of 1988. The Commission has concluded that a 2–level enhancement with a minimum offense level of 13 should apply to all fraud cases involving a conscious or reckless risk of serious bodily injury." U.S.S.G.App. C, am. 156 (1995).

**18.** We note, however, that prior to the 1995 addition of § 2F1.1(b)(4), Application Note 9(c) to § 2F1.1 (1987) provided for an upward departure if the conduct was harmful or serious in ways other than in dollar amount, specifically, if "the offense caused or risked physical or psychological harm." The district court is free to consider that provision on remand.

"both what conduct or acts were within the scope of the defendant's agreement to participate in the jointly undertaken criminal activity and whether the jointly undertaken criminal activity was reasonably foreseeable to the defendant." Shay contended that only the receipts available during September and October of 1989 were reasonably attributable to him. At sentencing, the court made no particularized findings on this point, but stated that "an awful lot" or a "considerable amount" of the materials dumped at the site were known by Shay to be in non-compliance with what PADER was shown on the April 1989 visit to the transfer stations, and that such non-complying dumping continued almost throughout the period.

Two issues are at play here: a legal issue, again relating to *ex post facto* considerations, and a factual issue, relating to Shay's criminal liability. Under the Guidelines in effect in October of 1989, even if Shay actually was responsible for between $1,500,000 and $2,500,000 in loss, his base sentence would only be increased by either 9 or 10 levels, not 12 levels. § 2F1.1(b)(1)(J)–(K) (1988). Upon remand, the court is to consider that version of the Guidelines, and to likewise reconsider the second factual issue, whether Shay can be held responsible for the entire fraud amount, in the light of the language and policies enunciated in that version of § 1B1.3 and § 2F1.1(b)(1).

## 2. Herzog's Assertions of Error

### a. Sufficiency of Evidence

Appellant Herzog asserts that the trial judge improperly denied his post-trial motion to dismiss Counts Twenty–Seven, Twenty–Eight, and corresponding Racketeering Act Twenty for insufficient evidence. The Government asserts the following facts:

In July 1990, Herzog and attorney John Zagari met with engineers employed by CHMR to discuss CHMR's performing of sampling and testing operations at the Matamoras site. Herzog and Zagari falsely told the CHMR engineers that PADER had approved the previous dumping at Matamoras. Herzog and Zagari then insisted that a CHMR report conclude that more fill should be brought into the site and that nothing needed to be removed from the site.

When CHMR began sampling by trenching at the Matamoras site in August 1990, heavy concentrations of hydrogen sulfide gas emerged from the ground. Because such explosive gas presented a danger to workers and the community, the trenching was immediately terminated and CHMR began to use test borings as a safer sampling method. PADER continued to insist that the site be cleared and emptied and that CHMR's report address and evaluate removal remedies.

Despite Zagari's efforts to dictate the contents of CHMR's report by threatening the CHMR employee responsible for preparing the report, CHMR's draft December 1990 report indicated that the debris at Matamoras reflected a very high percentage of wood in the material; that decomposition of the structural lumber in the debris had caused the high levels of hydrogen sulfide gas detected at the site; and that one recommended corrective measure was removal of the existing waste. The draft report did not propose the addition of more C & D debris. After receiving this draft report, Zagari sent CHMR his redraft of the text of CHMR's recommendations, making them consistent with Herzog's earlier demands. Then, in a series of meetings and conversations with CHMR representatives, Zagari made it clear that CHMR would not be paid unless the report included the proposals that Zagari and Herzog demanded. Herzog and Zagari also told CHMR they would be paid only after filling operations recommenced.

Thereafter, a final report was provided to Zagari in which no conclusions were contained in the text of the report (instead, conclusions were in a separate cover letter); the wood content of the fill was reported to be within a falsely understated range; a reason offered for not removing the fill was the explosive nature of the hydrogen sulfide gas; the addition of more fill material was listed as the preferred remediation proposal; and removal of the offending debris was not addressed or evaluated in any way as a corrective option. After defendants received this final report, they stopped making payments to CHMR.

The prosecution alleged in counts Twenty–Seven and Twenty–Eight that Herzog schemed "to obtain a favorable report" on the Matamoras landfill "by falsely promising to pay" CHMR for that report. Three former CHMR employees testified in support of these charges: Robert Clarke, Donald Barshter and Michael Poe. After trial, Herzog moved to dismiss Counts Twenty–Seven and Twenty–Eight as well as RICO Act 20, asserting that no evidence was presented from which a rational jury could infer that defendants made false promises to pay CHMR. The undisputed testimony, according to Herzog, is that CHMR's bill had been paid in full, and that the company had undertaken a subsequent project for the defendants.

In denying Herzog's motion, the district court stated that "defense counsel made a tactical decision [at trial] to omit ... proof of the purported post–1990 payments to CHMR. That decision ... cannot be a basis now to overturn an otherwise proper conviction by a trial jury." Herzog argues that the court thereby impermissibly shifted the burden of proof: It was the Government's burden to show that CHMR had not been paid, not Herzog's burden to show that it had. He states that, because no rational jury could conclude from the evidence in the record that CHMR had not been paid, the two Counts and the Act must be dismissed.

■ A challenge to the sufficiency of the evidence supporting conviction by jury trial is viewed in the light most favorable to the Government. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Amiel,* 95 F.3d 135, 141 (2d Cir.1996) (quoting *United States v. Badalamenti,* 794 F.2d 821, 828 (2d Cir. 1986)). The verdict will be sustained unless *no* "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Count Twenty–Seven charged wire fraud; Count Twenty–Eight charged

mail fraud. " ' "[T]he essential elements of a mail [or wire] fraud violation are (1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the mails [or wires] to further the scheme." ' " *United States v. Dinome,* 86 F.3d 277, 283 (2d Cir.1996) (quoting *United States v. Miller,* 997 F.2d 1010, 1017 (2d Cir.1993) (quoting *United States v. Wallach,* 935 F.2d 445, 461 (2d Cir.1991))) (alterations in original, some alterations in *Miller* ). *See also Amiel,* 95 F.3d at 142 (mail fraud only).

■ Herzog's argument misses the mark, because it is based on the erroneous assumption that the Government needed to prove that CHMR had not been paid. In fact, it needed only to present evidence from which a juror could rationally infer that Herzog had intended to defraud CHMR. "To establish the existence of a scheme to defraud, the government must present proof that the defendants possessed a fraudulent intent.... [T]he government is not required to show that the intended victim was actually defrauded[, but] need only show that the defendants contemplated some actual harm or injury." *Wallach,* 935 F.2d at 461 (citations omitted) (discussing mail fraud); *see United States v. Gelb,* 700 F.2d 875, 879 (2d Cir.1983) (same); *Dinome,* 86 F.3d at 283 (discussing mail and wire fraud). The evidence at trial was sufficient to show intent to defraud CHMR. *See Gelb,* 700 F.2d at 880 ("[P]roof need only be sufficient to establish a specific intent [to defraud, which] need not necessarily be proved by direct evidence, but may also be inferred from the defendant's actions and other circumstantial evidence."). The trial court thus properly denied Herzog's Rule 29(c) motion to dismiss those counts.

**b. Herzog's Sentencing Increases**

Herzog next asserts that the district court improperly applied three different sentencing guideline increases to his sentence, and that his sentence should therefore be vacated and remanded.[19]

---

**19.** As noted in our discussion of *ex post facto* concerns relating to Shay's sentence, a sentencing court ordinarily applies the Guidelines in effect at the time of sentencing. Herzog's sentencing occurred on February 20, 1996, bringing into effect the 1995 version of the Guidelines. Because Herzog's conduct continued into 1992, and because the 1995 Guidelines do not provide

## 1) Obstruction of Justice

Section 3C1.1 of the November 1995 Guidelines provides: "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense" a two-level increase is warranted. In imposing this increase to Herzog's sentence, the court relied heavily upon the Presentence Report (PSR). The PSR reported PADER's 1990 civil enforcement action against, *inter alia,* Herzog, and described his related January 16, 1991, deposition as being "replete with fraudulent statements with regard to virtually every aspect of the Matamoras site." The PSR stated that, while "Herzog was not charged with perjury, it is our position that his offering of counterfeit statements was indeed purposeful, and as such, constitutes the obstruction of justice."

In finding that there were indications of Herzog's "significant guilty knowledge which led him to perjure himself in the civil case," the sentencing court stated that "the activities of the PADER lawsuit, which while they required an indictment, occurred after the FBI was investigating the matter and probably at the incentive or instance and request of PADER, among others. It is adequate to support an adjustment for intentional efforts to impede an ongoing investigation." The court thus found that Herzog was aware of the federal investigation and that his knowledge of it was the motivation for his perjury in the state deposition.

 Herzog counters, however, that even if the judge believed that perjury occurred in the related state civil regulatory suit, that should not constitute a basis for an obstruction of justice enhancement in this criminal federal action. Certainly, there are circumstances in which perjury in a state civil action would be utterly irrelevant to a federal criminal matter, even if the same defendant were involved. Here, however, the connection between the two cases is quite close. We agree with the district court's conclusion that, here, perjury in the civil action could

constitute obstruction of justice in the instant federal offense.

 In order for the court to properly reach the conclusion that Herzog's statements in the state deposition *did* actually warrant imposition of the § 3C1.1 obstruction of justice enhancement, the court was required to make certain findings. Application of § 3C1.1 generally requires findings of willfulness and materiality. *See* U.S.S.G. § C1.1 comment. (n.3(d),(f)–(h)). The willfulness requirement means that the enhancement "is appropriate only upon a finding that the defendant had the 'specific intent to obstruct justice, i.e., that the defendant consciously acted with the purpose of obstructing justice.'" *United States v. Defeo,* 36 F.3d 272, 276 (2d Cir.1994) (citation omitted); *see also United States v. Reed,* 49 F.3d 895, 900 (2d Cir.1995) ("[T]he term 'willfully' implies a *mens rea* requirement."), *aff'd after remand,* 88 F.3d 174 (2d Cir.1996).

 An enhancement for obstruction of justice may therefore be granted if the court finds that the defendant willfully and materially impeded the search for justice in the instant offense. Such obstruction can be accomplished in many ways, one of which is the giving of perjured testimony. If a court chooses to rely upon allegedly perjured testimony as a basis for application of the enhancement, however, it must make specific findings which indicate that the judge has considered all of the elements of perjury, including materiality, and has found that they have all been met. *United States v. Dunnigan,* 507 U.S. 87, 92–95, 113 S.Ct. 1111, 1115–17, 122 L.Ed.2d 445 (1993) required that, before applying this enhancement on the basis of apparent perjury, a sentencing court must explicitly find that the defendant gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory"—i.e., that the defendant committed perjury rather than simply providing false testimony. *Id.* at 94, 113 S.Ct. at 1116. *Dunnigan* went on to hold that this requirement could be met if the court

for a higher level of sentencing than would those in effect in 1992, no *ex post facto* concerns arise.

The court thus properly applied the 1995 Guidelines.

makes a finding of obstruction of justice which encompasses all of the factual predicates for perjury, though noting that distinct findings on each element of the alleged perjury were preferable. We have held that a finding of perjury must include findings that the witness gave false testimony concerning a material matter with the willful intent to provide false testimony. *See United States v. Catano–Alzate*, 62 F.3d 41, 43 (2d Cir. 1995) (per curiam); *see also, United States v. Williams*, 79 F.3d 334, 337–38 (2d Cir. 1996) (sentencing court must make finding of willful perjury even if defendant's testimony was so inherently untruthful that factual predicates to perjury were obvious); *United States v. Cox*, 985 F.2d 427, 432–33 (8th Cir.1993).

Our law to date, therefore, provides that in order to base a § 3C1.1 enhancement upon the giving of perjured testimony, a sentencing court must find that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter.

Judge Brieant's express finding that Herzog committed perjury and was motivated to do so by the existence of the federal investigation is adequate to meet the willfulness requirement, as well as elements "a" and "b" of the third perjury finding. We do not believe, however, that the court addressed the second element of materiality nor the third materiality prong of the perjury element.

We understand the materiality element to mean ordinarily that the intentional giving of false testimony must be material *to the proceeding in which it is given*. In other words, Herzog can be found to have committed perjury in the state proceeding only if the sentencing court finds that he intentionally gave false testimony which was material *to the state civil action*. *Dunnigan* requires this finding prior to. application of the enhancement based on "perjury."

This case presents an additional twist. Where, as here, the enhancement is applied based upon perjury made not in the instant judicial proceeding, but, rather, in a related but separate state action, we must assume that the element of materiality which is required by the Guidelines (as opposed to that required for a finding of perjury) must refer to a finding that the false testimony is material *to the instant action*. Just because perjured testimony is given in a related action, and simply because that testimony is found to have been material to the related proceeding, does not mean that the statements are material to the instant proceeding. We believe that, even if the court finds that Herzog's statements constituted perjury because they were material to the state proceeding, it must also find that the perjury was material to the instant federal offense before applying that state perjury as the basis for a § 3C1.1 enhancement of his federal sentence. We thus hold that, when false testimony in a related but separate judicial proceeding is raised as the basis for a § 3C1.1 obstruction of justice enhancement, a sentencing court may only apply the enhancement upon making specific findings that the defendant intentionally gave false testimony which was material to the proceeding in which it was given, that the testimony was made willfully, i.e., with the specific purpose of obstructing justice,[20] and that the testimony was material to the instant offense.

The sentencing court did not make findings with respect to either aspect of materiality. Although Judge Brieant found that the false state deposition was *motivated by* the instant federal offense, motivation alone does not equate to materiality. We therefore vacate Herzog's sentence and remand for additional findings.

**2) Duress/Aggravating Role**

Herzog argued at sentencing that "the real manager and supervisor" of the criminal activity was Alphonse D'Arco, a high-ranking member of the Luchese Crime Family with an alleged hidden interest in the

---

**20.** "Willful" is thus distinct from "intentional," which is the purposeful giving of the false testi- mony.

Matamoras landfill. He insists that his own apparent authority derived from D'Arco's "duress, coercion and blackmail." On appeal, he argues that the court violated his Due Process rights by failing to subpoena D'Arco to testify in an evidentiary hearing on this matter, and that the court thereby erroneously applied a four-level increase, pursuant to § 3B1.1(a), as a result of Herzog's leadership role in the crimes charged. Both his argument at sentencing and his appeal to us seem to blend two issues: whether a downward departure should be granted on the basis of duress pursuant to § 5K2.12, and whether an upward departure should be applied on the basis of aggravating role pursuant to § 3B1.1(a). Although "[g]enerally ... a failure to depart downwardly is not appealable[,] .... if the due process right asserted by appellants exists and the denial of a departure violated that right, the constitutional aspects of the denial would be appealable." *Gigante*, 94 F.3d at 56 n. 2 (citing *United States v. Colon*, 905 F.2d 580 (2d Cir.1990)). We thus will address both issues, as did the district court.

 Section 5K2.12 provides that the court may depart downwardly "[i]f the defendant committed the offense because of serious coercion, blackmail or duress," which "[O]rdinarily ... will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party...." Section 3B1.1(a) provides for an increase of four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive...." U.S.S.G. § 3B1.1(a) (1995). The sentencing court is entitled to broad discretion in resolving disputed factual issues, including an assessment of the credibility of witnesses. *E.g., United States v. Beverly*, 5 F.3d 633, 642 (2d Cir. 1993). The court also enjoys broad discre-

tion on the decision of whether an evidentiary hearing is necessary, *see Ibanez*, 924 F.2d at 430, and the Due Process Clause does not mandate that the court conduct "a full-blown evidentiary hearing," *United States v. Olvera*, 954 F.2d 788, 792 (2d Cir.1992).

 The district court found Herzog's assertion that he was coerced into his conduct to be "almost ... frivolous" in light of Herzog's close dealings with the Luchese Family.[21] The court's determination that Herzog was not subjected to duress and corresponding refusal to subpoena D'Arco was not erroneous and did not constitute a violation of due process. After reviewing the trial transcript, we agree that "[h]ardly have we ever known anyone who was so willingly duressed." We find no error in the trial court's refusal to depart downwardly on the basis of duress.

 Likewise, we believe that the court correctly disregarded Herzog's allegation that D'Arco was the true "leader" of the Matamoras scheme, and held that Herzog's sentence should be enhanced based upon his leadership role. This circuit, however, requires a sentencing court to make two specific findings prior to imposing any offense-role enhancement: "(i) that the defendant was 'an organizer or leader,' and (ii) that the criminal activity either 'involved five or more participants' or 'was otherwise extensive.'" *United States v. Patasnik*, 89 F.3d 63, 68 (2d Cir. 1996); *see United States v. Fermin*, 32 F.3d 674, 682 (2d Cir.1994) (remanding because district court failed to make finding as to whether defendant was "manager or supervisor"), *cert. denied*, — U.S. —, 115 S.Ct. 1145, 130 L.Ed.2d 1104 (1995). While the court expressly found that Herzog acted as a manager, it failed to make findings with respect to the issues of whether "five or more persons" were involved in the criminal activity or whether the activity was "otherwise

---

21. The court stated that its "initial reaction is to regard [Herzog's assertion of duress and fear] almost as frivolous. The facts at trial show that Mr. Herzog participated in robbing D'Arco of money, that doesn't show very much fear that somebody had body bags in his car and was going to kill you." The court noted, for example, that Herzog had initiated communications with a

crime operation headed by John Gotti, Jr., and stated "it's highly unlikely to me that a person who has been subject to duress by organized crime ... is going to willingly have any relationships whatever with John Gotti, Jr., whose exploits and those of his father are reported in the daily newspapers so that everyone knows about them."

extensive." [22] Without this finding, the more appropriate enhancement would be the two-level increase permitted by § 3B1.1(c), which applies to organizers or leaders of non-extensive criminal activities. *See United States v. Carrozzella,* 105 F.3d 796, 802–05 (2d Cir. 1997). We therefore remand for additional fact-finding on this second necessary finding.

### 3) Enhancement for $500,000 in Laundered Monies

Finally, Herzog argues that the district court improperly added three points, pursuant to U.S.S.G. § 2S1.1(b)(2)(D), for his having laundered over $500,000. Herzog asserts that this figure represents the total amount of allegedly laundered funds charged in all 28 money laundering counts and 14 related racketeering acts, despite the fact that he was acquitted of all but six of the money laundering counts and three of the related racketeering acts. Because the amount of laundered money corresponding to those charges and acts is only $70,000, Herzog argues that he should have received no increase, per § 2S1.1(b)(2)(A).

Herzog first again makes the argument relating to the district court's refusal to subpoena D'Arco, which we have already rejected. Because, he asserts, D'Arco's testimony would possibly have provided more information as to the amount of money actually laundered, his due process rights are violated by the imposition of this enhancement without issuance of a subpoena for an evidentiary hearing. For the reasons enunciated *supra,* we reject this argument.

Second, Herzog raises the issue which we have already dealt with in our discussion of Shay's sentencing enhancements—the use of the "preponderance of the evidence" standard of review on unconvicted conduct. We have already declined Appellant's invitation to re-visit this matter. In light of the pre-sentence report findings, we find that the district court properly applied the lower preponderance standard to enhance Herzog's sentence in accordance with the entire $500,-000 laundered amount. We therefore affirm the court's sentence in this regard.

### Conclusion

Shay's sentence is remanded for recalculation under the Guidelines in effect in October of 1989, at the time that the conduct charged in Count Five occurred. Herzog's sentence is remanded for additional findings as to the materiality of his false testimony in the related state civil proceeding to both that proceeding and to this case, and for findings as to whether more than five people were involved in the scheme to defraud or whether the scheme was otherwise extensive.

---

22. The entirety of the court's comments regarding aggravating role reads as follows: "This Court observes that D'Arco was hardly ever there and that Mr. Herzog performed many significant management functions having to do with checks and money[,] appearing at hearings, dealing with governmental agencies, and to say that he was not a manager simply denies reality."