**Sean PENICK, Petitioner,**

v.

**Gary FILION, Respondent.**

No. 97–CV–5527.

United States District Court, E.D. New York.

April 2, 2001.

**146**

port, even under *Sanders v. Sullivan,* 863 F.2d 218 (2d Cir.1988), the Second Circuit opinion on which petitioner relies, petitioner has not established any constitutional violation in connection with his conviction. At the evidentiary hearing, Judge Mann gave petitioner the fullest opportunity to present evidence. Based upon the evidence adduced at that hearing, I agree with Judge Mann that Singletary's recantation was material but that it was unreliable.

■ Amendment of the petition to allow a claim under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), is granted. However, for the reasons stated by Judge Mann, and even treating all of the withheld material cumulatively, *see Kyles v. Whitley,* 514 U.S. 419, 441, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the claim is without merit.

The petition for a writ of habeas corpus is denied. A certificate of appealability is denied.

**SO ORDERED.**

Mitchell J. Briskey, New York City, for Petitioner.

Camille O'Hara Gillespie, District Attorney of Kings County, Brooklyn, NY, for Respondents.

### *ORDER*

GERSHON, District Judge.

■ Petitioner Sean Penick's petition for a writ of habeas corpus was referred to the Honorable Roanne L. Mann, United States Magistrate Judge, who held an evidentiary hearing and issued a Report and Recommendation dated October 5, 2000 recommending denial of the petition. Petitioner has objected to the Report which is, therefore, reviewed *de novo.*

■ It is unnecessary to address petitioner's constitutional argument that AEDPA violates Article III if read to foreclose the Court from considering Circuit opinions as well as Supreme Court opinions for, as Judge Mann well-stated in her Re-

### *REPORT AND RECOMMENDATION*

MANN, United States Magistrate Judge.

This petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, was referred to the undersigned by the Honorable Nina Gershon for a report and recommendation. Thereafter, petitioner Sean Penick ("petitioner" or "Penick") sought permission to amend his petition to add a claim pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). For the reasons that follow, this Court recommends either that Penick be permitted to amend his petition and that the amended petition be denied in its entirety, or that his motion to amend and his original petition be denied.

## BACKGROUND

### The State Court Proceedings

Following a trial by jury in Kings County Supreme Court, Penick was convicted of robbery in the first degree and tampering with a witness in the third degree. On February 6, 1992, he was sentenced by Justice Joseph Slavin to consecutive prison terms of six to twelve years on the robbery charge and two to four years on the witness-tampering charge. Sentencing Transcript dated February 6, 1992, at 19–20; Petitioner's Memorandum in Support of Petition for Writ of Habeas Corpus ("Pet. Mem.") at 1. The prosecution was based on the complaint of John Singletary ("Singletary"), who alleged that on April 7, 1991, petitioner, along with his co-defendants James Beard ("Beard") and Andre Ingram ("Ingram"), robbed him at gunpoint of $550.00 in cash (Trial Transcript of December 1991 ["Trial Tr."] at 104–10), and that on May 9, 1991, petitioner and Ingram thrust a machinegun in his mouth and threatened to kill him unless he dropped the charges. *Id.* at 116–19.

At trial, the prosecution called five witnesses on its direct case: Singletary; Police Officers David Moskowitz and John Kaiser, who responded to Singletary's 911 call on the day of the robbery; Detective Ronald McClean, who investigated Singletary's report that petitioner and Ingram had threatened him; and Detective Robert Desmond, who investigated Singletary's robbery allegations.

Defense counsel cross-examined Singletary extensively about his past crimes, which included: driving drunk into a parked police car, and failing to pay the fine for the offense (*id.* at 164, 166–69); keeping a gun in his home while on probation (*id.* at 171–72); various burglaries (*id.* at 194–98), including an armed burglary (*id.* at 199–200); and breaking the window of a police car (*id.* at 201). Singletary was further cross-examined regarding his suicidal tendencies, his alcoholism and drug abuse, his hospitalization in 1985, and his drinking on the day of the robbery. *Id.* at 146–47, 162–66, 204–05. In addition, Singletary admitted on cross-examination that he initially did not provide the officers investigating the robbery with the names of any of his assailants, although he knew both Ingram and petitioner. *Id.* at 191–92.

The defense theory at trial was that Singletary had been walking in the defendants' neighborhood in the vicinity of a playground, openly carrying a gun, and that Beard, a corrections officer with the authority to seize an unlicensed firearm, took the gun, and nothing more, from Singletary, with the assistance of petitioner and Ingram. In support of this defense, the criminal defendants called three witnesses who testified that it was Singletary who was carrying a gun, which Beard, with the help of petitioner and Ingram, removed from him. These three witnesses were: Tanya Butler, a friend of Beard's wife, who also knew petitioner and Ingram; Miguel Nieves, a friend of Beard's and Ingram's; and co-defendant Andre Ingram. In addition, petitioner called Police Officer Kelly Brown, whose testimony impeached Singletary's explanation of an error in the police report regarding the address of the incident. *Compare id.* at 389 *with id.* at 156.

In rebuttal, the prosecution introduced evidence about the duties of a correction officer to turn over to his or her supervisor or the local precinct any gun seized from a third party; the rebuttal case also included testimony from Beard's supervisor and from a sergeant from the 73rd Police Precinct that Beard never turned in any gun. *Id.* at 516–33. The prosecution also called Beard's wife, Marie Beard, who testified that her husband had his gun with him

when he left their home on the date of the incident. *Id.* at 542.

The jury was then charged and began deliberating. The jury requested that five different portions of the transcript be re-read to them: (1) Singletary's testimony about how Beard displayed his gun, and what Beard was wearing; (2) Singletary's testimony regarding the alleged threat by Penick and Ingram to induce him to drop the charges; (3) Butler's testimony regarding the number of people at the scene of the alleged robbery and whether or not Singletary had his dog with him; (4) Butler's testimony regarding the gun allegedly possessed by Singletary; and (5) Marie Beard's testimony about Beard's gun. *Id.* at 708–09. After nine hours of deliberation, the jury found petitioner guilty on both charges against him; they also convicted his co-defendants. *Id.* at 713–17.

On April 8, 1992, several months after petitioner's sentencing, Singletary went to the 71st Precinct and partially recanted his trial testimony to Detective Steve Litwin. Singletary said that he had lied at trial and that the criminal defendants had robbed him of a gun but had not taken any money. *See* Exhibit ("Ex.") A, annexed to Pet. Mem.; Respondent's Affidavit in Opposition to Petition for a Writ of Habeas Corpus, dated December 19, 1997, at 4. Petitioner and his co-defendants were not notified about the recantation until April 23, 1993, when an Assistant District Attorney ("ADA") from the Appeals Bureau wrote a letter to defense counsel disclosing the recantation; the letter also stated that on April 22, 1992, after speaking with the trial prosecutor, Singletary had retracted

his recantation, claiming that he had been drunk when he made his recantation. Pet. Mem. Ex. A.

Almost two years later, on January 18, 1995, petitioner moved to vacate his sentence based on Singletary's recantation,[1] arguing that "because the recantation was 'material,' due process entitled him to at least a hearing to assess the recantation's reliability." Pet. Mem. at 18–19. The prosecution opposed the application. In a written decision entered on January 19, 1996 (*see* Pet. Mem. Ex. B), Justice Anne G. Feldman denied petitioner's motion based on her review of the record, holding that:

> In this case the proffered evidence is far too unreliable to have changed the verdict and would merely tend to impeach the complainant's prior testimony. Recantation evidence has been held to be inherently unreliable and is insufficient alone to require setting aside a conviction (*see, People v. Legette*, 153 A.D.2d 760, 761, 545 N.Y.S.2d 296; *People v. Donald*, 107 A.D.2d 818, 819, 484 N.Y.S.2d 651). Moreover the inherent shortcomings of such evidence are enhanced here by the temporary nature of the recantation and by the threats against the complainant.

Defendant's claim of a violation of due process is also without merit. "Only recantations of material testimony that would most likely effect the verdict rise to the level of a due process violation if a state alerted to the recantation, leaves the conviction in place." (*Sanders v. Sullivan*, 863 F.2d 218, 225.) Thus hav-

---

1. Petitioner also filed a direct appeal from his conviction, challenging the prosecutor's questioning of a rebuttal witness and peremptory challenges of potential jurors. On July 1, 1996, the Appellate Division unanimously affirmed Penick's conviction. *People v. Penick*, 229 A.D.2d 405, 645 N.Y.S.2d 73 (2d Dep't 1996). On September 25, 1996, petitioner's application for leave to appeal to the New York Court of Appeals was denied. *People v. Penick*, 88 N.Y.2d 1023, 651 N.Y.S.2d 22, 673 N.E.2d 1249 (1996). Petitioner is not challenging those rulings in this proceeding. Pet. Mem. at 23.

ing found the recantation to be neither credible nor reliable and that it would have had no impact on the trial, due process does not demand a hearing to investigate the complainant's credibility.

Accordingly, defendant's motion is denied without a hearing.

Pet. Mem. Ex. B at 3–4. On February 23, 1996, petitioner applied for leave to appeal Justice Feldman's decision to the Appellate Division. The prosecution opposed petitioner's application and, on March 21, 1996, Justice Thomas R. Sullivan of the Appellate Division, Second Department, denied petitioner's application without comment.

### The Evidentiary Hearing Before this Court

In his pending habeas petition, petitioner argues that, given Singletary's allegedly material and reliable recantation of his trial testimony, petitioner was denied due process when the state court refused to vacate his conviction or even to order an evidentiary hearing. In order to determine the reasonableness of the state court's determination that Singletary's recantation was neither reliable nor credible, this Court held an evidentiary hearing on June 23 and June 30, 1999. *See Grosso v. Artuz*, No. 97 Civ. 1623, 1998 WL 108011 (S.D.N.Y. March 12, 1998). Petitioner called Detective Steven Litwin ("Litwin"), former Assistant District Attorney Barry Tempkin ("Tempkin"), ADA Deanna Rodriguez ("Rodriguez"), Detective George Woods ("Woods"),[2] Beard, and Singletary. Respondent called no witnesses.

According to Litwin, to whom Singletary orally recanted his trial testimony, Singletary was upset and crying when he came to the precinct to recant, and asked Litwin to call him an ambulance because his head hurt. H. Tr. at 18, 21. Litwin did not recall that Singletary appeared to be drunk. *Id.* at 21.

After Singletary's post-trial recantation, Tempkin, the trial prosecutor, met with Singletary, who reaffirmed his trial testimony, claiming that he had been drunk when he recanted. *Id.* at 44. Tempkin had previously recognized Singletary's vulnerabilities as a witness, and he, along with his colleagues, had extensively cross-examined Singletary prior to trial. *Id.* at 49–50. At the evidentiary hearing, Tempkin denied having threatened, or promised benefits to, Singletary in connection with either his trial testimony or his repudiation of the recantation. *Id.* at 79–80. Rodriguez, Tempkin's supervisor at the time of the trial, had also questioned Singletary following his recantation and told him that nothing would happen to him if he continued to recant his trial testimony. *Id.* at 100; *see id.* at 81. Singletary had nonetheless repudiated his recantation and reaffirmed his trial testimony. *Id.* at 100.

Tempkin testified that after trial, he was informed by one of the investigating detectives that Singletary had made what the detective believed to be false reports of threats on his life. *Id.* at 39–40, 63.[3] Tempkin also acknowledged that he had helped Singletary obtain public housing benefits and welfare, and once or twice gave Singletary money for food. *Id.* at 42–43, 77–79, 84.

---

**2.** Detective Woods, one of the investigating officers, had no recollection of Singletary's recantation or of the case, except for Singletary's having been shot in the head (on June 23, 1991) in an incident in which petitioner was never implicated. Transcript of June

1999 Evidentiary Hearing ("H.Tr.") at 113–15.

**3.** The hearing testimony does not specify when these threats were allegedly made or reported to the police.

Despite its misgivings about the admissibility of the testimony, the Court permitted petitioner to call James Beard, Penick's co-defendant in the criminal case. *Id.* at 116–23. Beard (who did not take the stand at trial) testified at the hearing that he, along with petitioner and Ingram, took the gun from Singletary. *Id.* at 124. Beard claimed that he was scared because he did not know how to effect the arrest of Singletary, or what to do with the gun, and that he was worried about losing his job. *Id.* at 129–30. Beard allegedly took the gun to the Canarsie Pier and threw it in the water. *Id.* at 124. The following week, when questioned at his job about a robbery of $550, he denied having any knowledge of it, purportedly because he did not realize that the inquiry was connected to the incident involving Singletary. *Id.* at 138–39. Beard claimed to have known Singletary, with whom he allegedly had an argument four months prior to the robbery, when items of jewelry belonging to Beard and Ingram, valued at about $150, were taken during a party at Singletary's house. *Id.* at 142–43. Beard said that he had repeatedly demanded compensation from Singletary. *Id.* at 143–44.

Singletary also testified at the hearing. Singletary claimed to have no recollection of his recantation, even after the Court asked if Temkin's memorandum regarding the recantation refreshed his recollection. *Id.* at 168–69, 185–86; Petitioner's Exhibit ("PX") 2 for identification. Singletary reiterated his trial testimony, affirming that petitioner, Ingram and Beard had forcibly taken money from him—not a gun—on April 7, 1991. H. Tr. at 186. He further affirmed that he had not been carrying a gun and that it was Beard who threatened him at gunpoint on the day of the robbery. *Id.* at 186–87.

Singletary acknowledged that he has suffered from mental and physical problems, and that he sometimes feels psychotic. *Id.* at 169. He described Tempkin as a "bum," explaining that he felt betrayed by Tempkin, who had him committed him to a mental facility approximately three years after the trial. *Id.* at 171, 182–83. Singletary was particularly upset when Tempkin refused to release him from the witness protection program despite the fact that Singletary's girlfriend was pregnant and Singletary wanted to return to Brooklyn. *Id.* at 176.

Singletary also disclosed that the District Attorney's Office provided him with carfare or tokens on occasion, and "put their two cents in" to help him obtain housing. *Id.* at 175. However, he denied that the District Attorney's Office helped him to obtain welfare benefits. *Id.* at 180. Singletary could not remember the number of times he had reported threats on his life, but stated that any such reports to the police would have been true. *Id.* at 177–78. While admitting that he knew petitioner and Ingram prior to the robbery, Singeltary denied knowing Beard. *Id.* at 179.

## DISCUSSION

Petitioner argues that the writ should be granted because the state court incorrectly determined that Singletary's recantation was not material, reliable and credible. He also seeks to amend his petition to include a *Brady* claim on the basis of newly discovered impeachment evidence, and contends that the writ should be granted on *Brady* grounds. This Court recommends either that petitioner be permitted to amend his petition and that his amended petition be denied in its entirety; or that he not be permitted to amend the petition and that the original petition be denied.

## I. The Recantation

Petitioner claims that the state court erred in refusing to grant him a new trial on the basis of Singletary's recantation. The recantation occurred post-trial, and there is no evidence or even allegation that at the time of trial, the prosecutors knew or had any reason to know that Singletary would recant his trial testimony or that his trial testimony was false.

The Second Circuit has held, in *Sanders v. Sullivan*, 863 F.2d 218, 222 (2d Cir.1988) (*"Sanders I"*), and *Sanders v. Sullivan*, 900 F.2d 601, 605 (2d Cir.1990) (*"Sanders II"*), that even absent prosecutorial knowledge of perjury at the time of trial, a due process violation occurs when a state leaves a conviction in place after a credible recantation of material testimony. Other circuits have rejected the Second Circuit's analysis and have held that no due process violation occurs unless the prosecutor had knowledge of the perjury at the time of trial. *See, e.g., United States v. Tanner*, 61 F.3d 231 (4th Cir.1995); *Carter v. Johnson*, 131 F.3d 452 (5th Cir.1997); *Reddick v. Haws*, 120 F.3d 714, 718 (7th Cir.1997); *Jacobs v. Singletary*, 952 F.2d 1282, 1287 n. 3 (11th Cir.1992).

It is unclear whether the Second Circuit's *Sanders* decisions were implicitly overruled by the Supreme Court in *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), which declared that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Id.* at 400, 113 S.Ct. at 860.[4] In *Herrera*, the petitioner submitted affidavits stating that his deceased brother had committed the crimes for which the petitioner was convicted. *Id.* at 396, 113 S.Ct. at 858. The Supreme Court determined that there was no valid habeas claim, since the state court declined to consider this newly discovered evidence of innocence based on its having been untimely submitted, and there was no allegation of any constitutional violation in the underlying state proceeding.

The question remains whether the Second Circuit would treat its decisions in *Sanders I* and *II* as overruled by *Herrera*,[5] especially since *Herrera* involved mistaken identity, whereas *Sanders*, like this case, involved the potential perjury of a trial witness.[6] The Second Circuit might conclude that "the State's adherence to a conviction in the face of witness misconduct going to the heart of the trial process can be viewed as qualitatively different from adherence to a conviction in the face of innocent witness error." *Grosso* Opinion at *43. Nevertheless, petitioner has failed to establish his entitlement to issuance of a writ of habeas corpus—particularly in light of the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA"), which

---

**4.** The Court did recognize the possibility of a narrow exception to this rule, which exception is not applicable here: "[I]n a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* at 417, 113 S.Ct. at 869.

**5.** In an unpublished report and recommendation adopted by the district court, Magistrate Judge Michael Dolinger discussed this issue at length. Report and Recommendation, *Grosso v. Artuz*, No. 97 Civ. 1623(SAS)(MHD) (S.D.N.Y. March 12, 1998) (*"Grosso* Opinion") at 39–42, aff'd, 1998 WL 341935 (S.D.N.Y. June 19, 1998).

**6.** However, in contrast to the recantations in *Sanders* and *Grosso*, Singletary's recantation was not made under oath, and thus there are no conflicting sworn statements by the witness as to petitioner's guilt.

amended the habeas corpus statute, 28 U.S.C. § 2254, and limits the power of federal courts to grant writs of habeas corpus to state prisoners.

## A. The Constraints Imposed by the AEDPA

As the Supreme Court has recently explained, the 1996 amendments to section 2254

place[ ] a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000) (quoting portions of 28 U.S.C. § 2254(d)(1)).

Here, petitioner does not—and indeed cannot—contend that the state court's decision is "contrary to" clearly established Supreme Court precedent. The Supreme Court has never held that even absent prosecutorial knowledge of perjury at the time of trial, a defendant may establish a due process violation based on perjury on the part of a prosecution witness. *See supra* p. 151.

Nor does petitioner demonstrate that the state court's decision involved an "unreasonable application of" clearly established Supreme Court precedent—the alternative basis for relief under section 2254(d)(1). Indeed, petitioner's argument rests almost exclusively on the Second Circuit's constitutional analysis in *Sanders* (*see* Pet. Mem. at 25–26), which, as previously noted, has been rejected by most of the circuit courts that have addressed the issue.[7]

Accordingly, given the limited power of federal courts to grant writs of habeas corpus to state prisoners under the amendments to section 2254, Penick's petition should be denied.[8]

---

**7.** Petitioner does cite *Herrera* for the proposition that "[d]ue process prohibits a State from punishing a person who is actually innocent." Pet. Mem. at 24–25. In fact, a majority of the justices in *Herrera* did not embrace that view, except under limited circumstances in capital cases. *See supra* p. 151 n. 4. Even the Second Circuit has not yet decided that issue. *See Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 113 (2d Cir.2000), *cert. denied*, — U.S. ——, 121 S.Ct. 175, 148 L.Ed.2d 120 (2000).

**8.** In his reply papers, which predated *Williams*, petitioner argued that, to the extent that section 2254(d)(1) limits the habeas court's analysis to federal law "as determined by the Supreme Court," the statute is unconstitutional. Reply Memorandum and Request for Evidentiary Hearing in Support of Petition for a Writ of Habeas Corpus at 12–25. Although the Supreme Court has not expressly addressed this constitutional issue, its decision in *Williams* essentially forecloses such an argument. *See also Lindh v. Murphy*, 96 F.3d

## B. Analysis Under *Sanders*

Even if the AEDPA permitted this Court to look to the Second Circuit's decisions in *Sanders* as embodying "clearly established Federal law," within the meaning of section 2254(d)(1), petitioner nevertheless has failed to establish any constitutional violation in connection with his conviction. Recantations of trial testimony are "'looked upon with the utmost suspicion,'" *United States ex rel. Sostre v. Festa*, 513 F.2d 1313, 1318 (2d Cir.1975) (quoting *United States v. Troche*, 213 F.2d 401, 403 (2d Cir.1954)), and, under Second Circuit caselaw, "[o]nly recantations of material testimony that would most likely affect the verdict rise to the level of a due process violation, if a state, alerted to the recantation, leaves the conviction in place." *Sanders I*, 863 F.2d at 225.

Accordingly, before relief may be granted on the basis of recanted testimony, three requirements must be met: "First, the petitioner must demonstrate that a trial witness has recanted his testimony.[9] Second, ... the court [must] determine whether the recanted testimony was 'material', that is, whether the recantation, if known to the jury, would 'probably' alter the outcome of the trial. Third, if the court finds that the recantation is 'material', it must then determine whether the petitioner has demonstrated that the recantation is 'reliable'." *Grosso v. Artuz*, No. 97 Civ. 1623(SAS)(MHD), 1998 WL 108011, at *1 (S.D.N.Y. Mar. 12, 1998) (citing *Sanders I*, 863 F.2d at 222, 225), *aff'd*, 1998 WL 341935 (S.D.N.Y. June 19, 1998).

The state court determined without a hearing that Singletary's recantation was not material, credible or reliable. Petitioner argues that the standard of review should be plenary, as the question presented is a mix of fact and law. Pet. Mem. at 34. Respondent claims that the determination that Singletary's recantation was not credible or reliable is a question of fact, and that therefore, under 28 U.S.C. § 2254(e)(1), the state court's determination should be presumed to be correct. Respondents' Memorandum of Law at 8.

Here, the question is whether Singletary's recantation was material and, if so, whether it was credible and reliable. Such a determination, while involving an analysis of the historical facts, turns on the legal significance of those facts, and therefore involves mixed questions of fact and law.

Under the AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(i). With respect to legal questions, a writ may issue if the state court adjudication resulted in a decision that "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Supreme Court has interpreted the "unreasonable application" clause to require an inquiry into "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 120 S.Ct. at 1521. Thus, a deferential standard of review applies to mixed questions.

856 (7th Cir.1996) (en banc) (rejecting constitutional challenge to AEDPA), *rev'd on other grounds*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Ramirez v. Senkowski*, 7 F.Supp.2d 180, 192 (E.D.N.Y.1998) (Nickerson, J.) (same), *aff'd*, 189 F.3d 462 (2d Cir. 1999).

**9.** That a recantation occurred in this case is not disputed.

### 1. Materiality

To determine the materiality of a recantation, a court must inquire whether, "but for the perjured testimony, the defendant would most likely not have been convicted." *Sanders I*, 863 F.2d at 226. In *Grosso*, Magistrate Judge Dolinger recognized that there were two possible approaches to this analysis: first, a court could consider the balance of the trial record and ignore the testimony of the recanter; alternatively, the court assume that the recanting witness would appear at trial and testify truthfully in accordance with his recantation. *Grosso* Opinion at 45–46.

Here, under either approach, Singletary's recantation—if believed—is material.[10] Singletary was the only prosecution witness with personal knowledge of his confrontation with petitioner, Beard and Ingram. If his trial testimony is not considered, or if it is assumed that Singletary would have testified truthfully in accordance with his recantation, the jury could not have convicted petitioner of the charged armed robbery.[11] The decisive issue, therefore, is the reliability of Singletary's recantation.

### 2. Reliability

A petitioner bears a heavy burden to establish the reliability of a recantation of trial testimony, as recanted testimony must be viewed "with the utmost suspi-

cion." *Sanders I*, 863 F.2d at 225; *Grosso* Rep. at 51. Where, as here, the recantation is unsworn, and is repudiated by sworn testimony, there is an even greater need for skepticism. *See United States v. DiPaolo*, 659 F.Supp. 120, 122 (W.D.N.Y.) (denying motion for new trial where oral recantation was unsworn and was repudiated in affirmation under oath), *aff'd*, 835 F.2d 46 (2d Cir.1987).

In this case, Singletary reaffirmed his trial testimony at the evidentiary hearing, clearly stating under oath that he was robbed of money, and not a gun, by petitioner, Beard and Ingram. H. Tr. at 186–87. His oral recantation, which he claimed not to remember, was not sworn. *Id.* at 186. Furthermore, Singletary's trial testimony was corroborated by Beard's wife, who testified at trial that Beard had his gun with him on the day of the robbery. Trial Tr. at 542. Additionally, although not introduced at trial, detectives were able to confirm the existence of "Chucky," the retired police sergeant from whom Singletary intended to purchase a bicycle with the money taken from him. H. Tr. at 62–63.[12]

At trial, co-defendant Ingram testified in support of the defense contention that a gun, rather than money, had been taken from Singletary. At the evidentiary hearing, petitioner offered the testimony of co-defendant Beard, who had not testified at

---

10. The Court need not defer to the state court on this issue, inasmuch as the state court's decision did not separately evaluate the issue of materiality, but instead combined the reliability and materiality analyses. The state court held, on the basis of the papers submitted, that Singletary's recantation "is far too unreliable to have changed the verdict," Pet. Mem. Ex. B at 3–4, and that since the recantation was neither credible nor reliable, "it would have had no impact on the trial, [and] due process does not demand a hearing to investigate the complainant's credibility." *Id.* at 4.

11. However, even accepting as true Singletary's recantation, petitioner nevertheless was involved in a robbery—of a gun, not cash. *See* Pet. Mem. Ex. A. Furthermore, the recantation did not undermine petitioner's guilt of witness tampering, except to the extent that it impeached Singletary's credibility generally.

12. Chucky died before trial. *Id.* at 63; Trial Tr. at 101.

trial. Beard provided the same account as Ingram, adding that he disposed of the gun by throwing it off the Canarsie pier. *Id.* at 124, 129–30.

This Court continues to entertain serious doubts about the admissibility of Beard's testimony at an evidentiary hearing on the reliability of a recantation as to which he had no knowledge. Nevertheless, having allowed the testimony, and having observed Beard's demeanor, this Court finds that the implausibility of Beard's story tends to corroborate—rather than undermine—Singletary's testimony at trial and at the evidentiary hearing, by the permissible inference that the opposite of Beard's testimony is true. If a witness is disbelieved, the fact-finder "is free, on the basis of [the] witness' demeanor, to 'assume the truth of what he denies' ...." *United States v. Marchand,* 564 F.2d 983, 986 (2d Cir.1977) (quoting *Dyer v. Mac-Dougall,* 201 F.2d 265, 268 (2d Cir.1952)). The trial jury in this case apparently disbelieved Ingram's testimony and, on that basis, and based on the other trial evidence, found that Ingram and his co-defendants robbed Singletary at gunpoint of $550.00. This Court comes to the same conclusion.

Having considered the record in its entirety, including the hearing testimony of Singletary and Beard, this Court finds no basis on which to disturb the state court's finding that Singletary's unsworn and repudiated recantation is unreliable. Accordingly, the state court's determination that no due process violation has occurred is a reasonable application of established federal law, and Penick's petition should be denied.

## II. *Brady* Claim

At the close of the evidentiary hearing, petitioner requested permission to amend his petition to add a *Brady* claim. H. Tr. at 188. Petitioner asked that his petition be amended to add the claim that he had been "[d]enied due process when the State withheld exculpatory evidence from the defense both at trial and for the ensuing seven and one-half years." Notice of Motion to Amend Habeas Corpus Petition, dated July 6, 1999 ("Motion to Amend") at 1. Specifically, petitioner alleges that the State withheld "crucial information concerning the credibility and reliability" of Singletary, including information about cash payments made to Singletary by the prosecution before and after trial; assistance provided to him in connection with his own arrests and in obtaining housing, welfare and other benefits; false death threats reported by him to the police; his commitment to a psychiatric facility at the request of the trial prosecutor; Singletary's reluctance to press charges or testify; and the prosecution's view of him as "manipulative" and suffering from multiple psychoses. *Id.* at 1–2. Petitioner contends that the withholding of the information prevented him from fully cross-examining Singletary at trial, and that the continued withholding of the information following Singletary's recantation further prejudiced petitioner by preventing him from raising his *Brady* claim in the state collateral proceeding. *Id.* at 2.

## A. Amendment of the Petition

"The Federal Rules of Civil Procedure apply to motions to amend petitions for a writ of habeas corpus." *Riley v. Taylor,* 62 F.3d 86, 89–90 (3d Cir.1995); *see* 28 U.S.C. § 2242 (a petition for a writ of habeas corpus "may be amended or supplemented as provided in the rules of procedure applicable to civil actions."). Rule 15(a) of the Federal Rules of Civil Procedure states that "a party may amend [its] pleading ... by leave of the court or by written consent of the adverse party," and

further provides that "leave shall be freely given when justice so requires." Fed. R.Civ.P. 15(a). A number of factors justify a court's denial of a motion to amend: "(1) undue delay; (2) bad faith or dilatory motive; (3) undue prejudice to the opposition; (4) repeated failures to correct deficiencies with previous amendments; and (5) futility of the amendment." *Riley,* 62 F.3d at 90; *Espey v. Wainwright,* 734 F.2d 748, 750 (11th Cir.1984). Here, petitioner states that he was unaware of the grounds for his *Brady* claim until disclosure was made in connection with the evidentiary hearing before this Court. While the State challenges that assertion in addressing the merits of petitioner's *Brady* argument, it does not complain that allowing the amendment would cause it undue prejudice. Accordingly, the primary issue on this motion concerns the futility of the proposed claim. Therefore, this Court will examine the viability of petitioner's *Brady* claim.

## B. Failure to Exhaust *Brady* Claim in State Court

As an initial matter, the Court must address the effect of petitioner's failure to have presented his *Brady* claim at any stage of the state court proceedings. A federal court may not *grant* habeas relief to a state prisoner on the basis of claims that have not been exhausted in state court. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 839, 119 S.Ct. 1728, 1730, 144 L.Ed.2d 1 (1999) ("Federal habeas relief is available to state prisoners only after they have exhausted their claims in state court."). Nevertheless, the AEDPA provides that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the ap-

plicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).[13] Although the legal standard for determining when to reach the merits of an unexhausted claim has not been articulated in the statute, or by the Supreme Court or Second Circuit, *see Velez v. Artuz,* No. 97 Civ. 3040(BSJ), 2000 WL 328634, at *1 (S.D.N.Y. March 29, 2000), courts have exercised their discretion and dismissed petitions on their merit where the unexhausted claim was meritless, *see Flores v. Greiner,* No. 97 CV 5671(RR), 2000 WL 1052054, at *9 n. 5 (E.D.N.Y. June 19, 2000), and was "inextricably intertwined" with a pending and fully exhausted claim. *Jackson v. Moscicki,* 99 Civ. 2427(JGK), 2000 WL 511642, at *10 (S.D.N.Y. April 27, 2000). As petitioner's *Brady* claim is meritless, *see infra* pp. 156–61, and is intertwined with the reliability of Singletary's recantation, this Court recommends that the *Brady* claim be denied on the merits.

## C. Merits of the *Brady* Claim

Under *Brady,* "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Kyles v. Whitley,* 514 U.S. 419, 432, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995) (quoting *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97). The *Brady* doctrine embraces evidence that impeaches a witness. *Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the

---

**13.** Prior to the enactment of the AEDPA, courts were required to dismiss in their entirety habeas petitions that mixed exhausted and unexhausted claims. *See Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379 (1982); *Levine v. Commissioner of Correctional Services,* 44 F.3d 121, 125 (2d Cir.1995).

result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). "A 'reasonable probability' of a different result is ... shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles,* 514 U.S. at 434, 115 S.Ct. at 1566 (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381).

### 1. Impeachment Evidence in Existence Before Trial

Here, much of the evidence cited by petitioner as part of his *Brady* claim did not arise until *after* petitioner's trial, and therefore, even the prompt disclosure of such evidence would have had no effect on the trial itself. The impeachment evidence that existed before trial but was not disclosed until the evidentiary hearing consists of: (a) cash benefits and other assistance provided to Singletary as part of his participation in the witness protection program; (b) certain information concerning Singletary's mental state, as reflected in the trial prosecutor's (post-trial) memoranda stating that Singletary suffered from multiple psychoses and was manipulative (Motion to Amend Ex. A, B); and (c) Singletary's reluctance to testify.

### a. Cash Benefits and Other Assistance.

Petitioner complains of the prosecution's failure to disclose the assistance provided to Singletary by the District Attorney's Office. The records reveal that Singletary received minimal benefits as part of his participation in the witness protection program after he was shot in the face on June 23, 1991. Specifically, Singletary received $18 a day for meals during the period from August 5, 1991 through November 17, 1991; in total he received less than $1,000.00 in monetary assistance (PX 4a-d, 4ah, 4aj–4au, 4ax), as well as shelter at a hotel for varying time periods from July 29, 1991 through February 1992 (PX 4e, 4f, 4j-p, 4aaa). Singletary periodically refused to remain in the witness protection program (PX 4o, 4av, 4ay), returned unused meal money (PX 4ah), and declined to stay at the hotel room reserved for him (PX 4aaa).

The District Attorney's Office also wrote various letters to assist Singletary: a letter dated October 8, 1991, requesting that Singletary be permitted to receive public assistance without revealing his address (PX 4i); letters dated November 20, 1991, January 14, 1993, and March 8, 1993, to the New York City Housing Authority, requesting emergency housing and an expedited transfer of housing (PX 4w-z, 4ae-f); a letter dated March 8, 1993, to the Technical Career Institute, explaining Singletary's absences from school due to his participation in the witness protection program (PX 4x); and a letter dated October 1, 1993, to the Social Security Administration, regarding the food and shelter that was provided to Singletary (PX 4s).

Early on in the trial, the state court ruled that the prosecution would not be permitted to elicit testimony from Singletary concerning his having been shot in the face on June 23, 1991. Trial Tr. at 66–68. In response to a question by Penick's counsel, Singletary testified on cross-examination that he was in the witness protection program. Trial Tr. at 204. Although defense counsel could have asked Singletary about the benefits that he was receiving as part of the program, he understandably chose not to pursue this line of inquiry; he apparently concluded that the value of any argument that Singletary had concocted the robbery in order to receive *de minimis* housing and cash benefits as a protected witness was far outweighed by the prejudice of opening the door to testimony regarding the reason for protective custody. *See United States v.*

*Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987). ("Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature.").

Accordingly, as defense counsel had knowledge of this possible line of impeachment, but chose not to pursue it at trial, petitioner cannot now claim that the prosecution's failure to provide detailed descriptions of the precise nature of the benefits offered to Singletary constitutes suppression of material evidence, in violation of *Brady*. *See United States v. Ruggiero*, 472 F.2d 599, 603 (2d Cir.1973) (failure to furnish grand jury transcripts not a *Brady* violation where defense counsel knew of likelihood that testimony would be favorable, but nevertheless failed to call grand jury witnesses at trial); *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). Furthermore, the failure to disclose the routine benefits provided to Singletary after he had been shot in the head, possibly in retaliation for his grand jury testimony in this case, are not material for *Brady* purposes. *See Hernandez v. Senkowski*, No. 93–CV–5763 (FB), 1996 WL 285426, at *2 (E.D.N.Y. May 17, 1996) (no constitutional violation occurred where prosecution failed to disclose "routine benefits provided to a witness whose life was endangered by testifying ....").

**b. Evidence Concerning Singletary's Mental State.** Petitioner concedes that he was aware of Singletary's psychiatric hospitalizations, based on the pretrial disclosure of Singletary's psychiatric records from hospitalizations in 1985 and 1991. Affidavit of Mitchell Briskey, Esq., dated July 6, 1999, at ¶ 5. Petitioner argues that the records do not "reveal the 'psychoses' Mr. Tempkin wrote about in 1992 and which Mr. Singletary described at the

hearing." *Id.* However, a prosecutor is under no obligation to disclose his own subjective impressions about a witness' testimony. *See United States v. Beasley*, 442 F.Supp. 1152, 1157 (E.D.La.1977); *cf. United States v. Pfingst*, 490 F.2d 262, 274 n. 14 (2d Cir.1973) (*Brady* not violated by failure to disclose internal government memorandum, of a "speculative nature," disclosing trial tactics). Petitioner provides no legal support for the admissibility of Tempkin's lay opinion of Singletary's mental state and/or his alleged manipulative personality, and it seems highly unlikely that such opinions would have been admitted. *See United States v. Delgado*, 903 F.2d 1495, 1499 (11th Cir.1990) (prosecutor's opinion about a co-defendant's guilt would not be admissible under Fed.R.Evid. 403). Consequently, disclosure of the information at issue could have had no direct effect on the outcome of the trial. *See Wood v. Bartholomew*, 516 U.S. 1, 6, 116 S.Ct. 7, 10, 133 L.Ed.2d 1 (1995) (failure to disclose inadmissible polygraph results did not violate *Brady* ).

In any event, contrary to petitioner's suggestion, the psychiatric records produced to Penick's attorney prior to trial do in fact include the diagnosis "atypical psychosis," and disclose "several previous psychiatric admissions" and evidence of suicidal and homicidal ideation. *See* attachments to Letter to Court dated August 17, 1999, from Mitchell J. Briskey, Esq. Penick's trial counsel thus was on notice of Singletary's history of psychosis. At trial, Penick's attorney sought to highlight Singletary's substance abuse problems and erratic behavior, rather than focus on psychiatric labels: on cross-examination, Singletary acknowledged that he was hospitalized in 1985 as a result of an alcohol and drug problem, and that his hospitalization was precipitated by an incident in which Singletary, high on cocaine, had asked a police offi-

cer to shoot him. Trial Tr. at 204–05. Furthermore, defense counsel apparently made the strategic decision not to cross-examine Singletary at trial regarding his subsequent hospitalization, in 1991 (*see id.* at 204): the trial court had excluded evidence concerning the shooting that had led to the depression and trauma revealed in the 1991 hospital records, and to have examined Singletary about that hospitalization would have run the risk of eliciting damaging testimony about the shooting.[14] *See id.* at 87–88, 83 S.Ct. 1194.

Against this backdrop, it cannot be said that the failure to have disclosed Temkin's subjective impression of Singletary's mental state and personality constituted improper suppression of *Brady* material. Moreover, inasmuch as the jury and the state court had ample information impeaching Singletary's credibility, there is no reasonable probability that, had Tempkin's personal views been disclosed by the prosecution, the outcome of the trial or post-trial proceeding would have been any different. *See United States v. Zagari,* 111 F.3d 307, 320 (2d Cir.1997) (jury had sufficient information with which to evaluate witness' credibility, and thus failure to disclose witness' mental illnesses and neo-Nazi leanings did not violate *Brady* ).

**c. *Singletary's Reluctance to Testify.*** Singletary testified at the evidentiary hearing that prior to trial, he had been "ignoring subpoenas" because he doubted that he would "get any justice," and that Tempkin had police officers bring him to

court. *Id.* at 172–73, 83 S.Ct. 1194. This evidence, even if considered impeaching, has far less probative force than the evidence introduced at trial that Singletary initially failed to provide the arresting officers the names of two of his assailants, Ingram and petitioner. Trial Tr. at 191–92. As impeachment evidence of Singletary's reluctance to identify his assailants was elicited at trial, the omission of this additional evidence is not material.

**2. *Post–Trial Impeachment Evidence***

The undisclosed impeachment evidence that arose after trial falls into two categories: (a) the District Attorney's Office handling of Singletary after trial, including the trial prosecutor's role in having Singletary removed to Bellevue, a psychiatric facility, and the DA's provision of post-trial assistance to Singletary; and (b) evidence that some police officers may have believed that Singletary reported false death threats in order to get attention. Petitioner argues that the withholding of this evidence had an impact on the state court proceedings, and violated *Brady.* However, even assuming *arguendo* that the withholding of impeachment evidence concerning post-conviction events may in certain circumstances give rise to a constitutional violation under *Brady,*[15] none of the impeachment evidence at issue here is material, as no reasonable possibility exists that earlier disclosure would have changed the outcome of the state court proceedings.

**a. *Witness' Handling by the District Attorney's Office.*** Petitioner claims that

---

14. Indeed, when petitioner's counsel pursued similar questions at the evidentiary hearing before this Court, Singletary responded by describing not only his psychotic feelings, but also the pain in his head from the bullet that is still lodged in it. H. Tr. at 169.

15. *But see Berger v. Stinson,* 97 F.Supp.2d 359, 369 (W.D.N.Y.2000) (evidence that did

not exist until after trial did not give rise to constitutional *Brady* violation, but merely constituted "newly discovered evidence") (citing *Castillo v. United States,* No. 92 Civ. 3982(PKL), 1993 WL 51181, at *8 (S.D.N.Y. Feb. 23, 1993)); *Almonte v. United States,* No. 93 Civ. 5750(PNL), 1994 WL 202739, at *2 (S.D.N.Y. May 23, 1994) (Leval, J.).

the suppression of evidence regarding Tempkin's role in having Singletary taken to a mental facility, and the assistance provided by the District Attorney's Office to Singletary following trial, violated the prosecution's *Brady* obligations. However, Tempkin's request for police assistance in removing Singletary to a psychiatric hospital is cumulative of other evidence of Singletary's long-standing mental problems, which was available to criminal defense counsel by the time of trial. The later impeachment evidence would only have amplified faintly that which the defense chose not to pursue on cross-examination of Singletary. Similarly, evidence concerning the prosecutors' post-trial efforts to assist Singletary with his benefits, education, or arrests, merely echoed the evidence of pretrial benefits provided to Singletary, which defense counsel was on notice of but chose not to elicit at trial. In short, the post-trial information was merely "additional evidence tending further to impeach the credibility of a witness whose character had already been shown to be questionable," *United States v. Rosner*, 516 F.2d 269, 273–74 (2d Cir.1975), and it could hardly have effected the outcome of either the trial or post-trial proceedings.

**b. False Death Threats.** Petitioner also claims that *Brady* was violated by the prosecution's failure to disclose that the police detectives involved in the case believed that at some unspecified time, Singletary had phoned in false death threats in order to get attention. Motion to Amend at 2. At the evidentiary hearing before this Court, Tempkin testified that he believed he was informed of the police officers' suspicions after trial. H. Tr. at 40.[16] However, two of the investigating police officers could not, at the hearing,

remember anything about false death threats (*id.* at 19–20, 115), and ADA Rodriguez recalled that, although there was "an issue as to whether or not certain threats that Mr. Singletary had claimed had come against him were false, ... [she] never learned any information that would indicate that they were in fact false." *Id.* at 95.

At best, this evidence reflects only that the police officers may have had questions about Singletary's reliability—as did Tempkin, who described how he and his colleagues extensively cross-examined Singletary before trial (*id.* at 49–50) and attempted to independently verify Singletary's complaint (*id.* at 62–63). Petitioner offers no support for the proposition that unconfirmed suspicions regarding Singletary's reports of death threats would have been admissible at trial or in post-trial hearings. *See* cases cited *supra* p. 24.

Furthermore, the defense possessed and exploited at trial much stronger impeachment material, including Singletary's criminal record, his drug and alcohol abuse problems, and his failure to disclose to the investigating officers the identities of the assailants who were known to him. In light of the evidence available at the time of trial, proof of the officers' suspicions is not material, as there is no reasonable probability that, had it been disclosed by the prosecution, the outcome of the trial or collateral state proceedings would have been different. *See Zagari*, 111 F.3d at 320. Simply put, proof of the officers' unconfirmed suspicions "could hardly have transformed the jury's image of [Singletary] from paragon to knave." *United States v. Gilbert*, 668 F.2d 94, 96 (2d Cir. 1981).

---

**16.** Temkin's post-trial memorandum does not reveal whether Singletary's complaints occurred before or after trial (*see* Motion to Amend Ex. A), and neither side sought to clarify this ambiguity at the hearing.

Accordingly, petitioner's *Brady* claims are without merit, and the amendment of his petition to add those claims would be futile.

### *CONCLUSION*

For the foregoing reasons, this Court recommends either that Penick be permitted to amend his petition for a writ of habeas corpus and that the petition (including amendments) be dismissed in its entirety on the merits, or that his motion to amend be denied and that the original petition be dismissed on the merits.

Any objections to the recommendations contained herein must be filed with the Honorable Nina Gershon on or before October 19, 2000. Failure to file objections in a timely manner may waive a right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to transmit a copy of this Report and Recommendation, by overnight courier, to all counsel of record.

SO ORDERED.

October 5, 2000.